Andrea DWORKIN, a citizen of New York; Priscilla Moree, a Wyoming citizen, individually and in her representative capacity of the Jackson, Wyoming Chapter of the National Organization for Women; and Judith Fouts, a Wyoming citizen individually and in her representative capacity of the Wyoming Chapter of the National Organization for Women, Appellants (Plaintiffs) Cross–Appellees,

v.

L.F.P., INC., a California corporation, also sometimes designated as LFP, Inc., L.F.P., Inc., a California corporation d/b/a Larry Flynt Publications; Hustler Magazine, Inc., a California corporation; Larry Flynt, a citizen of California; the Conservatorship of Larry Flynt, L.A. Superior Court # P688238, Jimmy Flynt, Conservator; Althea Flynt; Flynt Subscription Company, Inc., a Nevada corporation; Island Distributing Company, Ltd., a B.W.I. company; LFZ, Ltd., a B.W.I. company; Flynt Distributing Company, Inc., a California corporation; Inland Empire Periodicals, an Oregon corporation; Park Place Market Inc., a Wyoming corporation, Appellees (Defendants) Cross–Appellants.

L.F.P., INC., a California corporation, also sometimes designated as LFP, Inc., L.F.P., Inc., a California corporation d/b/a Larry Flynt Publications; Hustler Magazine, Inc., a California corporation; Larry Flynt, a citizen of California; the Conservatorship of Larry Flynt, L.A. Superior Court # P688238, Jimmy Flynt, Conservator; Althea Flynt; Flynt Subscription Company, Inc., a Nevada corporation; Island Distributing Company, Ltd., a B.W.I. company; LFZ, Ltd., a B.W.I. company; Flynt Distributing Company, Inc., a California corporation; Inland Empire Periodicals, an Oregon corporation; Park Place Market Inc., a Wyoming corporation, Appellants (Defendants) Cross–Appellees,

v.

Andrea DWORKIN, a citizen of New York; Priscilla Moree, a Wyoming citizen, individually and in her representative capacity of the Jackson, Wyoming Chapter of the National Organization for Women; and Judith Fouts, a Wyoming citizen individually and in her representative capacity of the Wyoming Chapter of the National Organization for Women, Appellees (Plaintiffs) Cross–Appellants.

Nos. 89–15, 89–16.

Supreme Court of Wyoming.

Sept. 18, 1992.

904

Gerry L. Spence and Gary L. Shockey of Spence, Moriarity & Schuster, Jackson, for appellants/cross-appellees in case No. 89–15 and appellees/cross-appellants in case No. 89–16.

Paul B. Godfrey, George E. Powers, Jr. of Godfrey & Sundahl, Cheyenne, and Alan L. Isaacman, David O. Carson, and Kirk N. Sullivan of Cooper, Epstein & Hurewitz, P.C., Beverly Hills, Cal., for appellees/cross-appellants in case No. 89–15 and appellants/cross-appellees in case No. 89–16.

Before MACY, C.J., and THOMAS, URBIGKIT, CARDINE,* and GOLDEN, JJ.

GOLDEN, Justice.

In this appeal a public-figure plaintiff who is an outspoken opponent of pornography seeks reversal of the summary judgment entered against her in her defamation action against certain media defendants.[1] She filed her defamation action because statements concerning her appeared in an article published in the July, 1985 issue of Hustler magazine. That article was recently before us in *Spence v. Flynt*, 816 P.2d 771 (Wyo.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 1668, 118 L.Ed.2d 388 (1992).

With the issues raised here we must explore the meaning of the free speech/libel provision of the Wyoming Constitution,[2] and the relationship of that provision to prevailing First Amendment jurisprudence of the United States Supreme Court.[3]

In particular, the public-figure plaintiff maintains that Wyoming's free speech/libel constitutional provision precludes a state trial court's use of summary judgment procedure in a public-figure libel action against a media defendant. A jury must decide all issues, the public-figure plaintiff asserts. The public-figure plaintiff also contends that the challenged statements were defamatory falsehoods and not protected speech. In the alternative, the public-figure plaintiff argues that even if the challenged statements are found to be "true" or protected speech under prevailing First Amendment law, under this state's free speech/libel constitutional provision the media defendant bears the burden of proving that the statements were published with good intent and for justifiable ends.

---

* Chief Justice at time of oral argument.

1. These defendants will frequently be referred to in the singular as "Hustler": L.F.P., INC., a California corporation, also sometimes designated as LFP, Inc., L.F.P., Inc., a California corporation d/b/a Larry Flynt Publications; Hustler Magazine, Inc., a California corporation; Larry Flynt, a citizen of California; The Conservatorship of Larry Flynt, L.A. Superior Court # P688238, Jimmy Flynt, Conservator; Althea Flynt; Flynt Subscription Company, Inc., a Nevada corporation; Island Distributing Company, Ltd., a B.W.I. company; LFZ, Ltd., a B.W.I. company; Flynt Distributing Company, Inc., a California corporation; Inland Empire Periodicals, an Oregon corporation; Park Place Market Inc., a Wyoming corporation.

2. **Freedom of speech and press; libel; truth a defense.**—Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right, and in all trials for libel, both civil and criminal, the truth, when published with good intent and [for] justifiable ends, shall be a sufficient defense, the jury having the right to determine the facts and the law, under the direction of the court.
Wyo.Const. art. 1, § 20.

3. "[F]reedom of speech and of the press—which are protected by the first amendment from abridgment by Congress—are among the fundamental personal rights and 'liberties' protected by the due process clause of the fourteenth amendment from impairment by the states." *Gitlow v. New York*, 268 U.S. 652, 666, 45 S.Ct. 625, 630, 69 L.Ed. 1138, 1145 (1925).

For the reasons given below, we reject the public-figure plaintiff's claims and affirm the trial court's order granting summary judgment against all of the plaintiffs below on all of the counts contained in the complaint.

## ISSUES

The public-figure plaintiff presented these issues for review:

1. Whether this Court will give full force and meaning to Wyoming's Constitutional provision which provides that "the jury [has] the right to determine the facts and the law, under the direction of the court" in a libel case.

2. Whether the publication was protected "opinion" and whether or not the determination of what is opinion is left to the jury under Wyoming's Constitution.

3. Whether the publication was made with "actual malice."

4. Whether the trial court invaded the province of the jury and resolved a disputed factual issue against Andrea Dworkin.

The media defendants rephrased the issues in this way:

1. Whether the statements made about plaintiff Andrea Dworkin were constitutionally protected statements of opinion.

2. Whether summary judgment was improper under Article I, Section 20 of the Wyoming Constitution.

 a. Whether Article I, Section 20 forbids summary judgment in a libel action.

 b. Whether the court's responsibility under the First Amendment to grant summary judgment on constitutional issues can be superseded by a provision of the state constitution.

3. Whether plaintiff Andrea Dworkin, a public figure, met her burden of coming forward with clear and convincing evidence that defendants published falsehoods about her with knowledge that they were false or with a subjective awareness of probable falsity.

4. Whether the publication about Dworkin was false and defamatory.

5. Whether there was a genuine issue of material fact with respect to Dworkin's advocacy of incest, bestiality and sex with children.

## BACKGROUND

The public-figure plaintiff, Andrea Dworkin (hereinafter Dworkin), is an outspoken opponent of pornography who has engaged in vigorous and robust national debate on the subject. She has worked to accomplish the passage of an anti-pornography ordinance in major cities in the United States and has written books and articles on a variety of subjects, including her opposition to pornography and her support of feminism and the women's liberation movement. She is an admitted public figure.

In earlier litigation filed by Dworkin against some of the same media defendants in this case, she was represented by lawyer Gerry Spence. *See Dworkin v. Hustler Magazine, Inc.,* 867 F.2d 1188 (9th Cir. 1989), *cert. denied,* 493 U.S. 812, 110 S.Ct. 59, 107 L.Ed.2d 26. As a result of Spence's representation of Dworkin, the media defendants in this case published an article in the July, 1985 issue of Hustler magazine featuring Spence as "Asshole of the Month." *Spence v. Flynt,* 816 P.2d at 793. In addition to speaking of and concerning Spence, the article refers to Dworkin. After stating that Spence on behalf of "the little guy" has won substantial monetary judgments against big corporations and would like to add Hustler to his list, the article speaks of Dworkin:

> His client is "little guy" militant lesbian feminist Andrea Dworkin, a shit-squeezing sphincter in her own right. In her latest publicity-grab Dworkin has decided to sue Hustler for invasion of privacy among other things.

Dworkin seems to be an odd bedfellow for "just folks," "family values" Spence. After all, Dworkin is one of the most foul-mouthed, abrasive manhaters on Earth. In fact, when Indianapolis contemplated an antiporn ordinance *co-authored* by Dworkin, she was asked by its supporters to stay away for fear her repulsive presence would kill the statute

* * *. Considering that Dworkin advocates bestiality, incest and sex with children, it appears Gerry "this Tongue for Hire" Spence is more interested in promoting his bank account than the traditional values he'd like us to believe he cherishes.

This case is a nuisance suit initiated by Dworkin, a crybaby who can dish out criticism but clearly can't take it. The real issue is freedom of speech, something we believe even Dworkin is entitled to, but which she would deny to anyone who doesn't share her views. Any attack on First Amendment freedoms is harmful to all [,] Spence's foaming-at-the-mouth client especially. You'd think someone of Spence's stature would know better than to team with a censor like Dworkin.

As a result of the publication of this article, Dworkin filed this lawsuit. She was one of three plaintiffs named in the action. The other two plaintiffs were Priscilla Moree, individually and as a representative of the Jackson, Wyoming Chapter of the National Organization for Women; and Judith Fouts, individually and as a representative of the Wyoming Chapter of the National Organization for Women. The complaint contained four claims. All of the plaintiffs alleged three claims: the media defendants, in publishing the article attacking the plaintiffs' attorney, sought to deprive the plaintiffs of obtaining justice, as guaranteed by Wyo. Const. art. 1, § 8; the media defendants' publication and distribution of the article constituted the tort of outrage (intentional infliction of emotional distress); and the media defendants' publication and distribution of the article constituted an overt act of conspiracy to discredit the plaintiffs and their attorney and to interfere with their exercise of rights under the Wyoming Constitution. For the fourth claim, Dworkin alone alleged that the media defendants' publication and distribution of the article constituted a libel of her. Under each claim, the plaintiffs sought fifty million dollars actual damages and one hundred million dollars punitive damages.

The parties conducted discovery, following which the plaintiffs moved for judgment on the pleadings as to the libel and outrage claims, and the media defendants moved for judgment on the pleadings or, in the alternative, summary judgment on all claims. The trial court held a hearing on the motions, then issued a decision letter, and finally entered an order denying the plaintiffs' motion and granting the media defendants' motion. This appeal followed.

█ In Dworkin's initial appellate brief, she addressed only issues relating to her libel claim. In the media defendants' appellate brief, they asserted that the plaintiffs had abandoned the other three claims (outrage, deprivation of justice, and conspiracy) by not raising issues relating to them in their appeal. In Dworkin's reply appellate brief, she contended that plaintiffs had not abandoned the other three claims. She contended that the trial court's decision letter was silent as to those claims and covered only dismissal of Dworkin's libel claim. We disagree. The media defendants' motion for judgment on the pleadings or, in the alternative, summary judgment was directed to "all counts of the complaint." In its decision letter, the trial court explained that the article was constitutionally protected and that, as a matter of law, the media defendants were entitled to judgment. The trial court's order granted their motion for summary judgment which was directed to all claims. It is clear to this court that the trial court's order disposed of all claims. Plaintiffs' failure to raise on appeal issues relating to the non-libel claims constitutes an abandonment of those issues. *See State Highway Comm'n v. Triangle Dev. Co.*, 371 P.2d 408 (Wyo. 1962), and *Wyuta Cattle Co. v. Connell*, 43 Wyo. 135, 299 P. 279 (1931). Even if the plaintiffs had not abandoned those claims, our decision today is dispositive of those issues.

We now turn to the issues remaining for our review.

## DISCUSSION

1. *Whether Wyo. Const. art. 1, § 20, precludes summary judgment in libel actions.*

Wyo. Const. art. 1, § 20, says that

[e]very person may freely speak, write and publish on all subjects, being responsible for the abuse of that right, and in all trials for libel, both civil and criminal, the truth, when published with good intent and [for] justifiable ends, shall be a sufficient defense, the jury having the right to determine the facts and the law, under the direction of the court.

■ Focusing on the provision's language "the jury having the right to determine the facts and the law, under the direction of the court," Dworkin asserts that "our framers granted preferential protection" to libel victims, namely, that no court can enter summary judgment in a libel action. Dworkin contends that all issues in a libel action must be presented to and decided by a jury. To develop and prove her position with respect to this state constitutional provision, Dworkin, and any other similarly situated litigant, must use "a precise, analytically sound approach. Counsel must provide [this court] with proper arguments and briefs to ensure the future growth of this important area of law." Robert F. Utter, *Advancing State Constitutions in Court,* Trial, Oct. 1991, at 45. Regrettably, Dworkin has failed to support her assertion and contention with appropriate constitutional analysis, legal authority, or cogent argument. In the face of such failure, our rule has been swift and sure: we refuse to consider the alleged error. *Burg v. Ruby Drilling Co., Inc.,* 783 P.2d 144, 153 (Wyo.1989). In this instance, however, in order to foster and promote the interpretation of our state constitution through an appropriate analytical technique,[4] we choose to consider the issue presented more fully than we did in *Spence*

*v. Flynt,* in which we summarily rejected the same contention by Dworkin's counsel.

■ Historically, our state trial courts have granted summary judgments in libel actions and this court has affirmed many of them;[5] this court has not had occasion until now to answer fully the precise issue Dworkin raises here. This court has, however, had occasion in the past to consider the constitutional language in question, and we find that consideration illuminating. In *Spriggs v. Cheyenne Newspapers,* 63 Wyo. 416, 182 P.2d 801 (1947), this court affirmed a verdict in favor of a media defendant after a review of the record convinced the court that the allegedly defamatory articles were true and published with good intent and for justifiable ends. Among the various points raised on appeal, the plaintiff insisted that in closing argument "he was entitled to argue either his own view or the view of others concerning the law under which the case should be decided entirely apart from what the court stated the law of this state in fact was." *Spriggs,* 63 Wyo. at 427, 182 P.2d at 804. After reviewing the decisions of sister states[6] having constitutional provisions textually similar to this state's free speech/libel provision, this court concluded that the trial court had correctly ruled the plaintiff could not discuss the law of the case independently of the instructions given by the court to the jury for their guidance. *Spriggs,* 63 Wyo. at 428, 182 P.2d at 809. In its review of sister states' decisions, this court explored the "judicial history of this and other like provisions in other state constitutions as an outgrowth of English and early American law concerning the subject of criminal libel * * *." *Spriggs,* 63 Wyo. at 428, 182 P.2d at 804.

**4.** Justice Robert F. Utter of the Washington Supreme Court has co-authored a particularly helpful article for the practicing lawyer on formulating and presenting a state constitutional argument. *See* Robert F. Utter and Sanford E. Pitler, *Presenting a State Constitutional Argument: Comment on Theory and Technique,* 20 Ind.L.Rev. 635–77 (1987). *See Appendix A* to this opinion for a comprehensive, but not exhaustive, list of law review articles on the subject of interpretation of state constitutions.

**5.** *Oil, Chemical & Atomic Workers Int'l,* 748 P.2d 283 (Wyo.1987); *Williams v. Blount,* 741 P.2d 595 (Wyo.1987); *MacGuire v. Harriscope Broadcasting Co.,* 612 P.2d 830 (Wyo.1980); *McMurry v. Howard Publications,* Inc., 612 P.2d 14 (Wyo. 1980); *Adams v. Frontier Broadcasting Co.,* 555 P.2d 556 (Wyo.1976); *Phifer v. Foe,* 443 P.2d 870, 41 A.L.R.3d 1078 (Wyo.1968).

**6.** Colorado, Mississippi, Missouri, and Ohio. *See Spriggs,* 63 Wyo. at 429–37, 182 P.2d at 805–08.

In light of that review, the court doubted the correctness of a jury instruction, earlier examined in *Nicholson v. State*, 24 Wyo. 347, 157 P. 1013 (1916), to the effect that the jury could disregard the court's instructions and apply the jury's own notion of what the law was. *Spriggs*, 63 Wyo. at 427, 182 P.2d at 804. Drawing on decisions from Colorado, Missouri, Ohio, and, in particular, Mississippi, this court demonstrated that our constitutional provision

> grew out of the practice in England as modified by what is known as the Fox Libel Act. Prior to that act in prosecutions for libel the verdict of the jury was special; the only question submitted to the jury being whether the alleged libel had been published and whether the language supported the innuendo. The question of libel or no libel was determined by the court. By the Fox Act the jury was authorized to return a general verdict of guilty, or not guilty, as in other criminal cases, and thus decide the question of libel or no libel, formerly decided by the court.

*Spriggs*, 63 Wyo. at 427–28, 182 P.2d at 804 (quoting *Nicholson v. State*, 24 Wyo. 347, 157 P. 1013, 1015 (1916)).

In *Spriggs* this court quoted with approval from *Oakes v. State*, 98 Miss. 80, 54 So. 79, 83, 33 L.R.A. (N.S.) 207:

> If juries have the right to determine the law of libel for themselves, free from the control of the court, the result would be not only that the law would be uncertain, because of the different views which different juries might take of it, but their judgment of the law, however erroneous, would be final; for in that event neither the trial court nor this court would have any right to review same, and could grant no relief to a defendant, however erroneously he may have been convicted. The court would have no right to decide any question of law which might arise on the trial, by demurrer or otherwise. Should a citizen, under this construction of the Constitution, be indicted for libel, and the matter charged to be such be

never so harmless or lawful, the court would be powerless to prevent his conviction and punishment, should the jury decide that, in its judgment, the matter charged was libelous. The jury would be the judge of the meaning of the Constitution and statutes, whether statutes were valid, what the common law is, what the law of privilege is—in short, of all questions of law which could arise on the trial.

*Spriggs*, 63 Wyo. at 431, 182 P.2d at 806.

This court continues to accept that reasoning as valid. For further historical perspective on the purpose of the Fox Act to protect freedom of speech by restoring to juries the same, but no greater, power in libel prosecutions than they had in other criminal prosecutions, see *Construction of Constitutional or Statutory Provision Giving Jury Power to Determine Law and Facts in Action for Libel or Slander*, 38 (1915 D) Ann. Cases 1261 (1915); Annotation, *Effect of provision that jury shall determine the law and the facts in libel cases*, 51 L.R.A.(N.S.) 369 (1914); Annotation, *Effect of provision that jury shall determine the law and the facts in libel cases*, 33 L.R.A.(N.S.) 207–12 (1911).

Although in *Spriggs* this court reviewed the history of the substance of Wyoming's free speech/libel constitutional provision, this court did not review the history of how that provision became a part of the state constitution. That history can be a valuable aid in interpreting the scope of a provision of the state constitution. Robert F. Utter and Sanford E. Pitler, *Presenting a State Constitutional Argument: Comment on Theory and Technique*, 20 Ind. L.Rev. 635, 657 (1987). In our effort to understand the constitutional language in question here we begin with a review of the proceedings of our state constitutional convention.

Convening in September, 1889, the constitution's framers had copies of the proposed and soon-to-be ratified constitutions of Idaho, North Dakota, South Dakota, Montana, and Washington.[7] Richard K.

---

**7.** *Idaho:*
Constitution ratified November 5, 1889. Idaho admitted to the Union, July 3, 1890;

the constitution became effective the same day.

Prien, *The Background of the Wyoming Constitution*, iii (Aug. 1956) (unpublished M.A. Thesis, University of Wyoming); T.A. Larson, *History of Wyoming*, 246–47 (1965). As our own examination reveals, and as Prien points out, a side-by-side comparison of article 6, § 5 of the South Dakota Constitution, with Wyoming's art. 1, § 20, the free speech/libel provision in question, reveals nearly identical text.[8] *See*, Prien, *supra* at 49–50. A comparison with Mont. Const. art. II, § 7, reveals closely similar text as well.[9] According to our research of the *Journals and Debates of the Constitutional Convention of the State of Wyoming* (1889), the framers established Committee No. 1 to consider the preamble and the declaration of rights article of the state charter, of which the free speech/libel provision is a part. *Id.* at 18. George W. Baxter of Laramie County was on that committee. *Id.* at 22; *see also* Henry J. Peterson, *The Constitutional Convention of Wyoming*, University of Wyoming Publications in Science, Vol. VII, No. 6 (1940). According to Melville C. Brown, the president of the convention, Mr. Baxter was "the author of much of our declaration of rights." Melville C. Brown, "Constitution Making," Address Given at a Meeting of Pioneers at Cheyenne, Wyoming, Winter 1898 *reprinted in* Wyoming Historical Collections, First Biennial Report of the State Historian of the State of Wyo-

ming (1920). Unfortunately, as we have previously noted,[10] reports of the several standing committees do not exist. Equally unfortunate, our review of the proceedings, and in particular Mr. Baxter's recorded discussions as reported in the floor debates, has not revealed any comment specifically concerning the free speech/libel constitutional provision in question. In the absence of helpful information from these sources, we look to other recognized sources.

We agree with Prien's conclusion that it is likely the framers borrowed our free speech/libel constitutional provision from South Dakota, with some consideration given to the Montana provision. Prien, *supra*, at 49–50. Working with that likelihood, we have turned to those sister states for judicial opinions which might give us guidance. In *Brodsky v. Journal Publishing Co.*, 73 S.D. 343, 42 N.W.2d 855 (1950), the South Dakota Supreme Court affirmed a directed verdict for the media defendant in the face of the plaintiff's contention that it was for the jury to determine whether or not the published article referred to the plaintiff. After reciting S.D. Const. art. 6, § 5, upon which the plaintiff relied and which as noted is nearly textually identical to our free speech/libel provision, the court stated:

Constitutional provisions and statutes having similar import have been adopted

---

*Montana:*
Constitution ratified October 1, 1889. Montana admitted to the Union, November 8, 1889; the constitution became effective the same day.
*North Dakota:*
Constitution ratified October 1, 1889. North Dakota admitted to the Union, November 2, 1889; the constitution became effective the same day.
*South Dakota:*
Constitution ratified October 1, 1889. South Dakota admitted to the Union, November 2, 1889; the constitution became effective the same day.
*Washington:*
Constitution ratified October 1889. Washington admitted to the Union, November 11, 1889; the constitution became effective the same day.
Charles Kettleborough, Ph.D., *The State Constitutions* (1918).

**8.** S.D.Const. art. 6, § 5:
Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right. In all trials for libel, both civil and criminal, the truth, when published, with good motives and for justifiable ends, shall be a sufficient defense. The jury shall have the right to determine the facts and the law under the direction of the court.

**9.** Mont.Const. art. II, § 7:
No law shall be passed impairing the freedom of speech; every person shall be free to speak, write or publish whatever he will on any subject, being responsible for all abuse of that liberty; and that in all suits and prosecutions for libel, the truth thereof may be given in evidence; and the jury, under the direction of the court, shall determine the law and the facts.

**10.** *Billis v. State*, 800 P.2d 401, 413–14 (Wyo. 1990).

in other jurisdictions. *Springer v. Swift,* 59 S.D. 208, 239 N.W. 171, 78 A.L.R. 1171. A review of the cases which have construed such provisions justifies the conclusion that they have not taken from the court or imposed upon the jury the duty of determining whether a communication is capable of a defamatory meaning. *Egan v. Eastwood,* 36 S.D. 42, 153 N.W. 917; 53 C.J.S., Libel and Slander, § 223(b); see also annotation in 33 L.R.A.N.S. 207. * * * Whether the published article in the instant case was libelous per se was a question for the court.

*Brodsky,* 42 N.W.2d at 857.

Even more helpful than *Brodsky* for our immediate purpose on the question of the court's power to decide questions of law in a libel case is *Williams v. Pasma,* 202 Mont. 66, 656 P.2d 212, (1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2122, 77 L.Ed.2d 1302 (1983). There, the Montana Supreme Court squarely held that that state's free speech/libel constitutional provision, textually similar to ours, does not preclude summary judgment in libel cases. In affirming a summary judgment in favor of a member of the state Democratic committee, the court quoted from its earlier decision in *Griffin v. Opinion Pub. Co.,* 114 Mont. 502, 512, 138 P.2d 580, 586 (1943):

> While our Constitution like that of Missouri, Colorado, South Dakota and Wyoming provides that in libel suits "the jury, under the direction of the court, shall determine the law and the facts," yet the decisions clearly show that the function of the court and jury is not greatly different in the trial of libel from what it is in other cases.

> In other words, it is for the court and not the jury to pass upon demurrers to the complaint; upon the admissibility of the evidence; upon motions for nonsuit; upon motions for a directed verdict; upon motions for a new trial and upon motions to set aside verdicts or vacate judgments.

*Pasma,* 656 P.2d at 215.

In view of our case law, the history of our constitutional provision, and the helpful opinions from sister jurisdictions having textually similar constitutional provisions, we hold that Wyo. Const. art. 1, § 20, does not preclude the trial court's use of summary judgment procedure in a defamation action.

### 2. *Summary judgment procedure in libel cases.*

In *Adams v. Frontier Broadcasting Co.,* 555 P.2d 556, 562 (Wyo.1976), this court recognized that a libel plaintiff's status as a public figure invokes the United States Supreme Court's actual malice standard for liability. We had recognized and adopted that standard in *Phifer v. Foe,* 443 P.2d 870, 41 A.L.R.3d 1078 (Wyo.1968). We often have applied that standard in affirming summary judgments. *See, e.g., Oil, Chemical & Atomic Workers Int'l v. Sinclair Oil Corp.,* 748 P.2d 283, 287–89 (Wyo. 1987); *McMurry v. Howard Publications, Inc.,* 612 P.2d 14, 17 (Wyo.1980); *MacGuire v. Harriscope Broadcasting Co.,* 612 P.2d 830, 831–33 (Wyo.1980); *cf. Williams v. Blount,* 741 P.2d 595 (Wyo. 1987).

The actual malice standard prevents a public figure, such as Dworkin, from recovering damages for a defamatory falsehood relating to a matter of public concern unless she proves with convincing clarity that the statement was made with actual malice, that is, with knowledge that it was false or with reckless disregard of whether it was false or not. *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 10, 110 S.Ct. 2695, 2707, 111 L.Ed.2d 1, 18 (1990); *Harte–Hanks Communications Inc. v. Connaughton,* 491 U.S. 657, 659, 109 S.Ct. 2678, 2681, 105 L.Ed.2d 562, 571 (1989); *Hustler Magazine Inc. v. Falwell,* 485 U.S. 46, 50, 108 S.Ct. 876, 878–79, 99 L.Ed.2d 41, 48 (1988) (same standard applies in action alleging intentional infliction of emotional distress); *Bose Corp. v. Consumers Union of U.S., Inc.,* 466 U.S. 485, 502, 104 S.Ct. 1949, 1960, 80 L.Ed.2d 502, 517 (1984); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 162, 87 S.Ct. 1975, 1996, 18 L.Ed.2d 1094, 1116–17 (1967); *New York Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct.

710, 725–26, 11 L.Ed.2d 686, 706–07, 95 A.L.R.2d 1412 (1964). That actual malice standard derives from the United States Supreme Court's interpretation of the First Amendment's free speech clause.[11]

This state's free speech/libel constitutional provision is textually different from the free speech clause of the First Amendment to the United States Constitution. In comparison with the text of its federal counterpart, Wyoming's free speech/libel provision is more elaborate and clearly worded. Expansive protection for freedom of expression seems to be invited by the state text that "Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right * * *." This provision, like similar provisions in thirty-eight other state constitutions, is phrased as an affirmative right, in contrast to the First Amendment's negative phrasing that restrains government action. *The Interpretation of State Constitutional Rights*, 95 Harvard L.Rev. 1324, 1399 (1982). Yet, the additional language of the state provision, that truth when published with good intent and for justifiable ends is a sufficient defense to libel, suggests a contraction of the protection for expression. *See Garrison v. State of Louisiana*, 379 U.S. 64, 70 n. 7, 85 S.Ct. 209, 214 n. 7, 13 L.Ed.2d 125, 130–31 n. 7 (1964) for a list of jurisdictions having similar, seemingly restrictive constitutional or statutory provisions. *See also* Frederic Jesup Stimson, *The Law of the Federal and State Constitutions of the United States*, §§ 60–61, pp. 144–46 (1908).

Additional evidence suggests a contraction of the protection for expression under our state constitution; Wyo. Const. art. 1, § 8, states in pertinent part: "[E]very person for an injury done to reputation shall have justice administered without sale, denial or delay."[12] Of course, under the *New York Times* doctrine, as *Garrison* recognized, "where the criticism is of public officials and their conduct of public business,

the interest in private reputation is overborne by the larger interest, secured by the Constitution, in the dissemination of truth." *Garrison*, 379 U.S. at 72–73, 85 S.Ct. at 215, 13 L.Ed.2d at 132.

■ "[T]here is no reason why we should not apply Wyoming constitutional provisions in the administration of our jurisprudence, as long as they do not infringe upon the constitutional standards of the United States Constitution." *Richmond v. State*, 554 P.2d 1217, 1223 (Wyo.1976). Does this state's free speech/libel constitutional provision infringe upon the First Amendment? If it does, if it is more restrictive (less protective) of the fundamental right to freedom of speech than the interpretation of that right by the United States Supreme Court, which, of course, is deemed the minimum permissible, then this court is constitutionally obligated to apply the less restrictive (more protective) federal interpretation. U.S. Const. art. VI; and Wyo. Const. art. 1, § 37 and art. 21, § 24; *State ex rel. Mansfield v. State Bd. of Law Examiners*, 601 P.2d 174, 75 (Wyo.1979); *Doe v. Burk*, 513 P.2d 643, 644 (1973). On the other hand, if this state's free speech/libel constitutional provision is less restrictive (more protective) than the First Amendment as interpreted by the United States Supreme Court, then, of course, we are free to apply our state provision which enlarges the right. *Richmond*, 554 P.2d at 1223.

In this case, however, it is unnecessary for us to engage in the rigorous examination required to determine whether our state free speech/libel constitutional provision provides more protection for freedom of speech than afforded under prevailing federal First Amendment law. That is simply because the federal floor in the public-figure/media defendant libel field, to be applied in this case, adequately protects the media defendants here from liability to Dworkin, as we shall show. And, as our prior libel case law richly illustrates, this

---

**11.** The First Amendment states, in pertinent part: "Congress shall make no law * * * abridging the freedom of speech, or of the press * * *."

**12.** *See Mills v. Reynolds*, 837 P.2d 48, 68–70 (Wyo.1992) (Golden, J., dissenting, for a discussion of the origins and meaning of Wyo.Const. art. 1, § 8).

court has readily embraced the federal doctrine in this specific area of free speech jurisprudence. That is not to say, however, that in a future case in a different area of free speech jurisprudence, this court would not undertake the necessary effort to determine the full scope of our free speech/libel constitutional provision.

In cases in which the fundamental right of freedom of speech is involved, as here, this court has declared:

> The best procedural protection for freedom of speech, which [the United States Supreme Court] standard is designed to protect, is found in the remedy of summary judgment which the courts have utilized freely in such cases. The chilling effect of litigation and the associated expense and inconvenience frequently have led courts to conclude that summary judgment is the most appropriate remedy in an instance such as this in order to minimize that chilling effect as much as possible.

*Adams*, 555 P.2d at 566 (citations omitted).

■ In applying the actual malice/convincing clarity standard in the summary judgment context, this court follows the same approach it uses in any other summary judgment setting: we have the same task as the trial court, we have the same material as that court, and we follow the same standards. *Sinclair Oil*, 748 P.2d at 288–89.

### 3. Whether the Hustler statements are actionable as a matter of law.

#### A. Milkovich Analysis.

In *Milkovich*, the United States Supreme Court's recent opinion in First Amendment libel jurisprudence, the Court refused to recognize, in addition to the established constitutional safeguards in the freedom of speech area, "still another first amendment-based protection for defamatory statements that are categorized as 'opinion' as opposed to 'fact.'" *Milkovich*, 497 U.S. at ——, 110 S.Ct. at 2705, 111 L.Ed.2d at

17. Thus, existing constitutional doctrine adequately secures the "breathing space" which "freedoms of expression require in order to survive." *Id.*, 497 U.S. at ——, 110 S.Ct. at 2706, 111 L.Ed.2d at 18.[13] One rule of that existing protective constitutional doctrine is that "a statement of opinion relating to matters of public concern which does not contain a provably false connotation will receive full constitutional protection." *Id.* See, e.g., *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986). The doctrine also provides full protection for "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual." *Milkovich*, 497 U.S. at ——, 110 S.Ct. at 2706, 111 L.Ed.2d at 19. See, e.g., *Falwell*, 485 U.S. at 50, 108 S.Ct. at 879, 99 L.Ed.2d at 48. As the Court stated in *Milkovich*, "This provides assurance that public debate will not suffer for lack of 'imaginative expression' or the 'rhetorical hyperbole' which has traditionally added much to the discourse of our nation." *Milkovich*, 497 U.S. at ——, 110 S.Ct. at 2706, 111 L.Ed.2d at 19.

■ As revealed by the Court's analysis of the statements reviewed in *Milkovich*, in determining whether an alleged defamatory falsehood purports to state or imply "actual facts about an individual," a court must scrutinize the type of language used, the meaning of the statement in context, whether the statement is verifiable, and the broader social circumstances in which the statement was made. *Id.*, 497 U.S. at ——, 110 S.Ct. at 2706–07, 111 L.Ed.2d at 18–19; and see dissenting opinion of Brennan, J., 497 U.S. at ——, 110 S.Ct. at 2709, 111 L.Ed.2d at 21.

#### B. Application of the Milkovich Analysis.

We shall now scrutinize the Hustler statements about Dworkin using the analytical technique applied in *Milkovich*.

---

13. *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 772, 106 S.Ct. 1558, 1561, 89 L.Ed.2d 783, 790 (1986) (quoting *New York Times v. Sullivan*, 376 U.S. at 272, 84 S.Ct. at 721, 11 L.Ed.2d at 701, 95 A.L.R.2d 1412 (1964)).

*• The type of language used.*

■ The kind of language used may signal readers that a writer is not purporting to state or imply actual, known facts. In *Milkovich*, the Court referred to *Greenbelt Coop. Publishing Ass'n, Inc. v. Bresler*, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), where the Court held that the word "blackmail," when used by a newspaper to characterize a land developer's negotiation position with the city, was not slander when spoken and not libel when written. The Court explained that "even the most careless reader must have perceived that the word was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable." *Greenbelt*, 398 U.S. at 14, 90 S.Ct. at 1542, 26 L.Ed.2d at 15. In *Falwell*, the Court held an ad parody "could not reasonably have been interpreted as stating actual facts about the public figure involved." *Id.,* 485 U.S. at 50, 108 S.Ct. at 879, 99 L.Ed.2d at 48. In *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers, AFL–CIO v. Austin*, 418 U.S. 264, 284–86, 94 S.Ct. 2770, 2781–82, 41 L.Ed.2d 745, 762–63 (1974), the Court found the word "traitor" in a literary definition of a union "scab" was not actionable since it was used "in a loose, figurative sense" and was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members." Abusive epithets, vulgarities and profanities are nonactionable. Rodney Smolla, *Law of Defamation* § 4.03, at 4–09 to –10 and § 6.12[10], at 6–52 (1991); *see* cases cited therein. The *ad hominem* nature of such language easily identifies it as rhetorical hyperbole which, as a matter of law, cannot reasonably be understood as statement of fact. Clearly falling into this category are Hustler's statements characterizing Dworkin as: " 'little guy' militant lesbian feminist," a "shit-squeezing sphincter in her own right," "one of the most foul-mouthed, abrasive manhaters on Earth," a "repulsive presence," "a cry-baby who can dish out criticism but clearly can't take it," "Spence's foaming-at-the-mouth client," and "a censor." Under prevailing constitutional First Amendment safeguards, that language cannot, as a matter of law, form the basis for a defamation claim.

*• The meaning of the statement in context.*

Certain formats—editorials, reviews, political cartoons, monthly features—signal the average reader to expect a departure from what is actually known by the writer as fact. As explained in another case, "[t]he reasonable reader who peruses [a] column on the editorial or Op–Ed page is fully aware that the statements found there are not 'hard' news like those printed on the front page or elsewhere in the news sections of the newspaper." *Ollman v. Evans*, 750 F.2d 970, 986 (D.C.Cir.1984), *cert. denied* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). *See also* Smolla, *supra*, § 6.12[4], n. 252 (collecting cases).

■ The Hustler article appears under the heading "Bits and Pieces" and is a regular monthly feature. The tone of the article is pointed, exaggerated and heavily laden with emotional rhetoric invoking first amendment principles. We are convinced that the average reader is fully aware that the statements found there are not "hard news." Readers of that column expect that Hustler's writers will make strong opinionated statements in that column, a recognized home of opinion and comment. That proposition is inherent in the very notion of a regularly appearing "Bits and Pieces" page which is akin to an editorial page.

*• Verifiability of the statements.*

■ There are four statements in the article which appear more likely to be objectively capable of proof or disproof and about which we will say more below. They are that Dworkin is a lesbian; supporters of the antipornography ordinance asked her to stay away; she advocates bestiality, incest and sex with children; and she initiated a nuisance suit. The remainder of the statements in the article, however, are not capable of being proved by objective means as either false or true. The terms "mili-

tant feminist," "shit-squeezing sphincter," "publicity-grab," "foul-mouthed abrasive manhater," "cry-baby," "foaming-at-the-mouth," and "censor" are hopelessly vague, imprecise, indefinite and amorphous. These terms are loosely definable and subjectively interpreted in such a variety of contexts that they cannot support an action for defamation. "Lacking a clear method of verification with which to evaluate a statement * * * the trier of fact may improperly tend to render a decision based upon approval or disapproval of the contents of the statement, its author, or its subject." *Ollman,* 750 F.2d at 981. *See also* Smolla, *supra,* § 6.12[5].

• *The broader social circumstances in which the statement was made.*

 The importance of social context has been recognized by the United States Supreme Court. The Court has observed, concerning the nonactionable words "scab" and "traitor" as applied to an employee who crossed a picket line, that "such exaggerated rhetoric was common place in labor disputes." *Old Dominion,* 418 U.S. at 286, 94 S.Ct. at 2782, 41 L.Ed.2d at 763. Just as labor's historical confrontation with management presents a widely recognized arena in which bruising and brawling, rough and tumble debate is the daily fare, so does the social, moral, and political clash between pornographers and antipornographers. Dworkin is an antipornography activist whose activities are in the form of public advocacy and direct political involvement. She participated in the drafting of the Indianapolis antipornography ordinance that was enacted and then held unconstitutional. *See Am. Booksellers Ass'n, Inc. v. Hudnut,* 771 F.2d 323 (7th Cir.1985). Hustler's *Bits and Pieces* article is an *ad hominem* attack against an advocate of a social, moral and political viewpoint contrary to Hustler's. The statements in question were uttered in the context of an ongoing debate in which Dworkin seeks to destroy the industry of which Hustler is a part. In response, Hustler seeks to destroy Dworkin's viewpoint by vilifying its advocate. In such a heated and spirited confrontation, of which the statements are a part, abusive epithets, exaggerated rhetoric and hysterical hyperbole are expected. "The offending phrases in this article are, unfortunately, representative of the type of language generated in a dispute over such a subject." *Ault v. Hustler Magazine, Inc.,* 860 F.2d 877, 881 (9th Cir.1988), *cert. denied,* 489 U.S. 1080, 109 S.Ct. 1532, 103 L.Ed.2d 837 (1989).

We agree with that said by the Ninth Circuit Court of Appeals: "Ludicrous statements are much less insidious and debilitating than falsities that bear the ring of truth. We have little doubt that the outrageous and the outlandish will be recognized for what they are." *Dworkin v. Hustler,* 867 F.2d at 1194. Vulgar speech reflects more on the character of the user of such language than on the object of such language. *Curtis Publishing Co. v. Birdsong,* 360 F.2d 344, 348 (5th Cir.1966).

Having applied the *Milkovich* analysis to most of the statements in the Hustler article, we must examine more closely those four statements which appear more likely to be objectively capable of proof or disproof. As we examine these four statements, we are mindful of the warning that we must "not engage, without bearing clearly in mind the context before us, in a Talmudic parsing of a single sentence or two, as if we were occupied with a philosophic enterprise or linguistic analysis." *Ollman,* 750 F.2d at 991.

The four statements are: Dworkin is a "lesbian"; when Indianapolis contemplated an antipornography ordinance co-authored by her, supporters asked her to "stay away for fear her repulsive presence would kill it"; Dworkin "advocates bestiality, incest and sex with children"; and Dworkin initiated a "nuisance suit" against Hustler. We consider these statements in the light of Dworkin's legal burden of having to prove with convincing clarity not only the falsity of the statements, but also that Hustler uttered them with knowledge of the falsity or in reckless disregard for the truth. As shall be seen, Dworkin has not satisfied her burden in this summary judgment setting.

■ Hustler has provided Dworkin's own writing to support its statement that she is a lesbian.[14] Neither in her argument before the trial court nor in her argument before this court has Dworkin challenged this particular statement. Thus, she has failed to carry her burden of proof in this instance.

■ To bolster the statement that supporters of the Indianapolis ordinance asked Dworkin to stay away for fear her repulsive presence would kill it, Hustler provided two pieces of evidence. The first was an article from the Village Voice entitled, *Censorship in the Name of Feminism.* This article describes the attempt to pass the antipornography ordinance. It reads:

Indianapolis, though, is not Minneapolis. When Mayor Hudnut heard of the Dworkin/MacKinnon bill at a Republican conference, he didn't think of it as a measure to promote feminism, but a weapon in the war on smut. He recruited City–County Councilmember Beulah Coughenour—an activist in the Stop ERA movement-to-introduce the law locally.

Coughenor's first smart move was to hire MacKinnon but not Dworkin as a consultant to the city in developing the legislation. * * * MacKinnon is * * * "respectable." * * * Of the law's co-authors, she was most likely to be accepted by Indianapolis's conservative city officials. Dworkin's style would not have gone over in Indianapolis—there are no crowds of anti-porn feminists to galvanize into action, while there are innumerable tight-laced conservatives to be alarmed by the feverish pitch of Dworkin's revival-style speeches, not to mention her overalls and unruly appearance.

Hustler also provided a New York Times article about the Indianapolis ordinance entitled, *A Feminist Offensive Against Exploitation.* Included in the article was the following statement: "In Indianapolis, where many of the ordinance's proponents

deemed Miss Dworkin too radical for the conservative community, Professor MacKinnon was brought in as a consultant * * *."

It is true that neither of these two articles on which Hustler relies directly states that supporters of the ordinance actually asked her to "stay away." It is clear to us, however, that the gist, the sting, the hurt of the articles and Hustler's statement based on them was that she was not hired as a consultant because it was felt her style would alarm the conservative supporters of the ordinance. The statement was substantially true. As this court recognized in *Tschirgi v. Lander Wyoming State Journal,* 706 P.2d 1116, 1120–21 (Wyo.1985), it is sufficient to show that the imputation is substantially true. *See also* Smolla, *supra,* § 5.08–.11.

■ It may also be said Hustler drew an inference from the article that Dworkin was asked to "stay away." Assuming that the inference drawn is false, Dworkin still must establish that it was drawn with actual malice. Dworkin fails to point to evidence of malice other than her statement that malice may be inferred from the character and content of the publication alone. Particularly in a case such as this, where Hustler reached an inference or interpretation from reputable source material, a mere inference of malice is insufficient. Plaintiff must show that the interpretation made was reached maliciously. Malice must be proved, because "punishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press. * * * The First Amendment requires that we protect some falsehood in order to protect speech that matters." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 340–41, 94 S.Ct. 2997, 3007, 41 L.Ed.2d 789, 805–06 (1974).

■ We turn next to Hustler's accusation that Dworkin advocates bestiality, incest and sex with children. Here again, Hustler provided source material for its

---

**14.** The writing appeared in Volume 4, number 2, the *Second Wave,* and is entitled, "What is Lesbian Pride." At the end of the writing, the reader is informed that it was delivered "at the rally for Lesbian Pride Week, Central Park, June 28, 1975 * * * sponsored by Lesbian Feminist Liberation."

statement from Dworkin's own writings. Hustler provided the trial court with a chapter entitled, *Androgyny: Androgyny, Fucking and Community,* from Dworkin's book, *Woman Hating.* In this chapter, Dworkin describes a model society in which "redefine[d] human sexuality" transforms "human relationships and the institutions which seek to control that relationship." She states that in androgynous community, "human and other-animal relationships would become more explicitly erotic." She advocates "destruction of the incest taboo" in order to develop "cooperative human community based on the free-flow of natural androgynous eroticism." Finally, she states that children have "every right to live out their own erotic impulses" and that the distinctions between children and adults would disappear as androgynous community develops.

Dworkin argues that her book merely discusses these practices rather than advocates them. This does not resolve the issue. Assuming that her claim is correct, since the book itself is not mentioned in the Hustler article, the question of fact to be resolved is not whether her book truly advocates these practices, but whether Hustler's interpretation of Dworkin's work as advocacy rather than description is "false" and was made with malice. Again, Dworkin has failed to show that the interpretation was reached maliciously.

On the subject of a critic's interpretation of another's writings, it has been said:

[C]ommentary on another's writing was considered a privileged occasion at common law and therefore received the benefit of the fair comment doctrine. When a critic is commenting about a book, the reader is on notice that the critic is engaging in interpretation, an inherently subjective enterprise, and therefore realizes that others, including the author, may utterly disagree with the critic's interpretation. The average reader further understands that because of limitations of space, not to mention those limitations imposed by the patience of the prospective audience, the critic as a practical matter will be able to support his opinion only by rather truncated quotations from the book or work under scrutiny. The reader is thus predisposed to view what the critic writes as opinion. In this context, courts have rightly been wary of finding statements to be defamatory, unless the statements misquote the author, put words into the author's mouth or otherwise clearly go beyond the realm of interpretation.

*Ollman,* 750 F.2d at 988. *See also,* Smolla, *supra,* § 6.12[7].

We believe that when dealing with interpretation of a literary work, we must be especially careful to guard the critic's right to express his opinion about the meaning of the work. Any author who places a book in the marketplace of ideas makes his work subject to criticism. Dworkin's book itself reinterprets fairy tales from a feminist perspective. Who is to say which interpretation is "true" and which "false"?

Furthermore, the United States Supreme Court has allowed latitude for the interpretation of ambiguous documents where a claim of libel is made. In *Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), the Court rejected the concept that a faulty interpretation of an ambiguous document could give rise to a claim for libel. In *Pape,* Time Magazine had erroneously reported that the United States Commission on Civil Rights had accused the plaintiff, a public official, of police brutality. Time misinterpreted a Commission report to say that the Commission had made the accusation; in fact, the Commission was only reporting allegations made by others. The Supreme Court stated that Time's omission of the word "alleged" when describing the incident of police brutality "amounted to the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities. The deliberate choice of such an interpretation, although arguably reflecting a misconception, was not enough to create a jury issue of 'malice' under New York Times." *Pape,* 401 U.S. at 290, 91 S.Ct. at 639, 28 L.Ed.2d at 53.

The United States Supreme Court recently stated concerning *Pape* that "[a] fair

reading of our opinion is that the defendant did not publish a falsification sufficient to sustain a finding of actual malice." *Masson v. New Yorker Magazine,* —— U.S. ——, ——, 111 S.Ct. 2419, 2434, 115 L.Ed.2d 447, —— (1991). The same is true in this case. Hustler's interpretation of Dworkin's work simply does not create an issue of malice for the jury.

■ Finally, we arrive at a statement which is difficult to classify. It has elements of either fact or hyperbole, depending on how it was used. Hustler accused Dworkin of filing a "nuisance suit" against Hustler. We have not located any authoritative definition of a "nuisance suit," but in the most narrow sense it appears to refer to a suit which the plaintiff knows is not well-founded in the law, but which is brought to browbeat the defendant into paying nominal damages rather than incurring legal fees and costs. A "nuisance suit" may also have a rhetorical meaning, however. In a rhetorical sense, a "nuisance suit" may be one which the defendant finds inconvenient or annoying to fight and which he feels confident the plaintiff will lose. When a litigant without legal training refers to a suit brought against him as a "nuisance suit," it is difficult to know whether he means that the suit is a nuisance in the narrow, technical sense or in a broader, rhetorical sense. In the rhetorical sense, calling a suit a "nuisance" should be viewed as expressing an opinion which cannot be proved by objective means. Even if a court rules for the plaintiff, that may not change the defendant's opinion that the suit was frivolous. The First Amendment protects expression of this sort of opinion. Dworkin had the burden of establishing that "nuisance suit" was meant in the narrow, technical sense. She has pointed to nothing which could satisfy that requirement. *See Camer v. Seattle Post Intelligencer,* 45 Wash.App. 29, 723 P.2d 1195, 1200–02 (1986), *cert. denied,* 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 677 (court held that a media defendant's attributing nuisance suits to a plaintiff did not constitute actionable libel). *See also Waldo v. Journal Co.,* 45 Wis.2d 203, 172 N.W.2d 680 (1969). There, the Wisconsin Supreme Court affirmed the trial court's dismissal of plaintiffs' libel complaint which alleged the defendant's use of the term "nuisance suit" to describe the plaintiffs' taxpayers' suit against the city was defamatory. Agreeing with the trial court that the term is an expression of opinion of the writer about the suit, namely, that he did not think it had great merit, the Supreme Court said,

> [t]o import any defamatory meaning to these words would result in a strained and unnatural construction and give effect to innuendoes that are neither apparent directly from the language nor arise by clear implication. Nothing in this language could reasonably be construed as harming the reputation of the plaintiffs, lowering them in the estimation of the community, or deterring third persons from associating or dealing with them.

*Waldo,* 172 N.W.2d at 684.

In the broader sense, there was some justification for Hustler to believe that it would prevail in *Dworkin v. Hustler,* and that the suit was a "nuisance." The Ninth Circuit Federal Court of Appeals said the following in its opinion:

> Attorneys [for Hustler] have requested double costs and attorneys' fees pursuant to Federal Rule of Appellate Procedure 38 and 28 U.S.C. § 1912. We have "discretion to award attorney's fees and costs as a sanction against a frivolous appeal. An appeal is frivolous if the result is obvious, or the arguments of error are wholly without merit." *DeWitt v. Western Pac. R.R. Co.,* 719 F.2d 1448, 1451 (9th Cir.1983).

We denied a similar request made by Hustler in *Leidholdt v. L.F.P., Inc.,* 860 F.2d 890, 895–96. Consequently, sanctions would be inappropriate in this appeal, which was filed under circumstances substantially similar to those of *Leidholdt.* However, the arguments made in this case have now been rejected by this court in *Leidholdt, Ault,* and in this case. *Should litigants raise similar contentions in subsequent cases, the courts hearing those cases may consid-*

er in the first instance whether sanctions are appropriate.

*Dworkin v. Hustler*, 867 F.2d at 1200–01 (emphasis added).

In summary, we have applied the appropriate *Milkovich* analysis to the statements of and pertaining to Dworkin. We hold that neither the statements considered individually nor the article considered as a whole constitute actionable defamation under controlling First Amendment law.

### 4. *Good motives and for justifiable ends.*

There remains one further point asserted by Dworkin which we choose to address. She claims that under the language "the truth, when published with good intent and [for] justifiable ends, shall be sufficient defense," as found in Wyo. Const. art. 1, § 20, these media defendants bear the burden of proving that the statements, even if "true" or constitutionally protected, were published with good motives and for justifiable ends. Again regrettably, she pursues this assertion in the same manner as she pursued her other contention that the subject constitutional provision precluded summary judgment in a libel action. Her assertion lacks constitutional analysis, legal authority, and cogent argument.

We have carefully studied *New York Times, Butts*, and the subsequent United States Supreme Court cases that have consistently adhered to that doctrine since first announced in 1964. In particular, we find *Garrison* most informative on the point Dworkin raises. In that case, the Court applied its *New York Times* rule and struck down a Louisiana criminal libel statute which, like the language of this state's free speech/libel constitutional provision, conditioned the defense of truth on the presence of good motives and justifiable ends. Where the challenged statements criticize public officials or public figures in matters of public concern, "the interest in private reputation is overborne by the larger public interest, secured by the Constitution, in the dissemination of the truth." *Garrison*, 379 at 73, 85 S.Ct. at 215, 13 L.Ed.2d at 132. Consequently, "[t]ruth may not be the subject of either civil or criminal sanctions where discussion of public affairs is concerned." *Garrison*, 379 U.S. at 74, 85 S.Ct. at 216, 13 L.Ed.2d at 133.

The Illinois Supreme Court adopted the *Garrison* approach in a civil libel action in *Farnsworth v. Tribune Co.*, 43 Ill.2d 286, 253 N.E.2d 408, 410 (1969). There, the court held that the "good motives and for justifiable ends" language of its free speech/libel constitutional provision was "incompatible with the United States Supreme Court's interpretation of the scope of the first amendment guarantees of the Federal Constitution." *See also, People v. Heinrich*, 104 Ill.2d 137, 83 Ill.Dec. 546, 550–555, 470 N.E.2d 966, 970–71, 68 A.L.R.4th 1003 (1984).

A few years later the Pennsylvania Supreme Court, in a criminal libel action, relied on *New York Times* and *Garrison* to hold a similar provision in the Pennsylvania Constitution repugnant to the First Amendment of the United States Constitution. *Commonwealth v. Armao*, 446 Pa. 325, 286 A.2d 626, 632 (1972).

■ As recognized in our state constitution,[15] the United States Constitution is the supreme law of the land. We hold, therefore, that the phrase "when published with good intent and [for] justifiable ends" of Wyo. Const. art. 1, § 20, is repugnant to the guarantees of the First Amendment of the United States Constitution in libel actions in which the *New York Times/Butts* standard applies to public figures who have been criticized by a media defendant regarding matters of public concern. Consequently, the media defendants in this case do not bear the burden Dworkin would have them assume.

We affirm the trial court's order granting summary judgment against all of the plaintiffs on all of the counts in the complaint.

### APPENDIX A

Interpretation of State Constitutions

Judith Hession, Comment, *Rediscovering State Constitutions for Individual Rights*

---

**15.** Wyo.Const. art. 1, § 37 and art. 21, § 24. *See* *also Doe v. Burk*, 513 P.2d 643 (Wyo.1973).

*Protection—Civil,* 37 Baylor L.Rev. 463 (1985)

Dorothy T. Beasley, *The Georgia Bill of Rights: Dead or Alive?* 34 Emory L.J. 341 (1985)

*The Interpretation of State Constitutional Rights,* 95 Harv.L.Rev. 1324–1502 (1982)

Earl M. Maltz, *False Prophet—Justice Brennan and the Theory of State Constitutional Law,* 15 Hastings Const. L.Q. 429 (1988)

J. Skelly Wright, *In Praise of State Courts: Confessions of a Federal Judge,* 11 Hastings Const. L.Q. 165 (1984)

Ronald K.L. Collins, *Reliance on State Constitutions—Away From a Reactionary Approach,* 9 Hastings Const. L.Q. 1 (1981)

George Deukmejian & Clifford K. Thompson, Jr., *All Sail and No Anchor—Judicial Review Under the California Constitution,* 6 Hastings Const. L.Q. 975 (1979).

Lawrence M. Newman, Note, *Rediscovering the California Declaration of Rights,* 26 Hastings L.J. 481 (1974)

Robert F. Utter & Sanford E. Pitler, Speech, *Presenting a State Constitutional Argument: Comment on Theory and Technique,* 20 Ind.L.Rev. 635 (1987)

Steve McAllister, Comment, *Interpreting the State Constitution: A Survey and Assessment of Current Methodology,* 35 Kan.L.Rev. 593 (1987)

Robert B. Keiter, *An Essay on Wyoming Constitutional Interpretation,* 21 Land & Water L.Rev. 526 (1986)

Glen S. Goodnough, Comment, *The Primacy Method of State Constitutional Decisionmaking: Interpreting the Maine Constitution,* 38 Me.L.Rev. 491 (1986)

John Sunquist, *Construction of the Wisconsin Constitution—Recurrence to Fundamental Principles,* 62 Marq.L.Rev. 531 (1979)

William F. Swindler, *State Constitutions for the 20th Century,* 50 Neb.L.Rev. 577 (1970)

William J. Brennan, Jr., *The Bill of Rights and the States: The Revival of State Constitutions As Guardians of Individual Rights,* 61 N.Y.U.L.Rev. 535 (1986)

Robert Vogel, *Sources of the 1889 North Dakota Constitution,* 65 N.D.L.Rev. 331 (1989)

James E. Leahy, *The Constitution is What the Judges Say It is,* 65 N.D.L.Rev. 491 (1989)

Don S. Willner, *A Second Look at Constitutional Interpretation in a Pioneer and Populist State,* 67 Or.L.Rev. 93 (1988)

Ken Gormley, *State Constitutions and Criminal Procedure: A Primer for the 21st Century,* 67 Or.L.Rev. 689 (1988)

Stewart G. Pollock, *State Constitutions as Separate Sources of Fundamental Rights,* 35 Rutgers L.Rev. 707 (1983)

Peter P. Miller, Note, *Freedom of Expression Under State Constitutions,* 20 Stan. L.Rev. 318 (1968)

Herbert P. Wilkins, *Judicial Treatment of the Massachusetts Declaration of Rights in Relation to Cognate Provisions of the United States Constitution,* 14 Suffolk U.L.Rev. 887 (1980)

*The Emergence of State Constitutional Law,* 63 Tex.L.Rev. 959 (1985)

Justice Hans A. Linde, *First Things First: Rediscovering the States' Bill of Rights,* 9 U.Balt.L.Rev. 379 (1980)

Justice Robert F. Utter, *The Right to Speak, Write, and Publish Freely: State Constitutional Protection Against Private Abridgment,* 8 U.Puget Sound L.Rev. 157 (1985)

Justice Robert F. Utter, *Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights,* 7 U. Puget Sound L.Rev. 491 (1984)

Monrad G. Paulsen, *State Constitutions, State Courts and First Amendment Freedoms,* 4 Vand.L.Rev. 620 (1951)

Robert Force, *State "Bill of Rights": A Case of Neglect and the Need for a Renaissance,* 3 Val.U.L.Rev. 125 (1969)

**922**

Maurice Kelman, *Foreword: Rediscovering the State Constitutional Bill of Rights,* 27 Wayne L.Rev. 413 (1981)

Don S. Willner, *Constitutional Interpretation in a Pioneer and Populist State,* 17 Williamette L.Rev. 757 (1981)

Robert F. Williams, *State Constitutional Law Processes,* 24 Wm. & Mary L.Rev. 169 (1983)

Junaid H. Chida, Comment, *Rediscovering the Wisconsin Constitution: Presentation of Constitutional Questions in State Courts,* 1983 Wis L.Rev. 483 (1983)

Linda B. Matarese, *Other voices: The Role of Justices Durham, Kaye, and Abrahamson in Shaping the "New Judicial Federalism,"* 2 Emerging Issues St. Const. Law 239 (1989)

David Schuman, *Advocacy of State Constitutional Law Cases: A Report from the Provinces,* 2 Emerging Issues St. Const. Law 275 (1989)

CARDINE, Justice, specially concurring.

I concur in the opinion of the court because of clear United States Supreme Court precedent. Nevertheless, I am less than enthusiastic over a state of law which allows a publisher to create a money-making business out of cruel, obscene, random attacks upon public figures. Nor am I able to justify these publications by equating them to the writing of Shakespeare or Chaucer. They are hardly in that class.

I could agree to reversal of summary judgment in *Spence v. Flynt,* 816 P.2d 771 (Wyo.1991), because Spence was subjected to a most bizarre, cruel, obscene libel only because he, as attorney, undertook representation of a client. Sadly, *Dworkin* is not in the same posture. My sympathies are with the dissenting justices, but established law requires my concurrence. *See Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990); *Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

In *Milkovich,* 497 U.S. 1, 110 S.Ct. 2695, the Supreme Court declined to create a separate, sweeping category of defamation exception for statements of "opinion" as opposed to statements of "fact." The Court noted that an "opinion" exception could unjustifiably shield defamatory statements if the speaker or writer couched his or her statement in terms of opinion. Instead, the Court found adequate the protections secured by existing constitutional doctrine. These protections include exclusion from liability for statements on matters of public concern which cannot be proven false, protection for statements which cannot reasonably be interpreted as stating actual facts, and plaintiff's burden of proving malice where a statement on a matter of public concern reasonably implies false and defamatory facts regarding public officials or public figures. *Milkovich,* 497 U.S. at ——, 110 S.Ct. at 2706–07. It is in the light of these three protected areas that I suggest that there should be some rethinking of the apparent absolute immunity from suit for defamation granted to publishers who, for profit, regularly and randomly attack public figures. The law of defamation in our sister common-law jurisdiction, Canada, provides guidance in striking a better balance between the right to reputation and freedom of speech and of the press. I firmly believe that freedom of speech and of the press can survive nicely without the protection now afforded the likes of *Hustler Magazine.* Nevertheless, I must for the reasons stated specially concur.

URBIGKIT, Justice, dissenting.

In this world of sloganistic wordsmanship and phrase making, it becomes easier than agonizing about the hard effort of thinking to relegate decision making to spontaneous reactivity and opinion-determining words. Spender, do-gooder, ultraconservative, soft on crime, gun control, abortion, and censorship serve as examples. In this case, the umbrella of the First Amendment casts a shadow which tends to exclude deeply important issues. These in-

clude summary judgment decision making. It is followed by an application of a derived or directed federal concept to diminish efficacy of our state constitutional right to the integrity of the whole individual to be protected by a jury trial review through a damage claim.

There is much with which I do agree in the scholarly and complete majority opinion. There was much about which I likewise agreed in the effort of Justice Thomas to write a majority opinion before this case was reassigned and with which I also joined in concept to favor disposition within the Wyoming Constitution.

I will leave the subject to be critically considered by Justice Thomas in his dissent regarding the broad base anticipations and concepts of the Wyoming Constitutional Convention when its members wrote Wyo. Const. art. 1, § 20. I will generally limit this dissent to the immediately pressing question regarding inappropriateness of deciding by summary judgment that the Wyoming Constitution is invalid. I also do not accept the view that the First Amendment to the United States Constitution determines that the provisions of Wyo. Const. art. 1, § 20 should be abrogated or ignored. I reject decision making for the libel case through summary judgment rather than jury trial exposure guaranteed by the explicit terms of our constitution.

The real issue we determine here is that Wyo. Const. art. 1, § 20 is involved and cannot be ignored whether or not, as the majority essentially determines, it is in essence invalidated by Fourteenth Amendment incorporation of the First Amendment to the United States Constitution. We do that when considering a scurrilous publication which, by any definition, panders a prurient course of character assassination. This is not an injunctive action to stop exposure of the world to the product—good, bad or indifferent. This is a damage case to assess defamation tort responsibility by exposure of the purveyor to a jury review and verdict decision. In *Spence v. Flynt*, 816 P.2d 771 (Wyo.1991), *cert. denied* —— U.S. ——, 112 S.Ct. 1668, 118 L.Ed.2d 388 (1992), the cause was to attack the attorney to defeat litigation, and now it comes directly in this case as an effort to defeat the muckraker by multiplying the quantity of muck.

First, let's look at the text of the two constitutional provisions. This is done to assess why the majority feels required to superimpose a federal veto on the *Allied–Signal, Inc. v. Wyoming State Bd. of Equalization*, 813 P.2d 214 (Wyo.1991) clear intent application of the Wyoming Constitution *in this case*. We would then deny the litigant access to a jury trial for review of unabused truth and good intent for justifiable ends as defenses.

Wyo. Const. art. 1, § 20 states:

**Freedom of speech and press; libel; truth a defense.**

Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right; and in all trials for libel, both civil and criminal, the truth, when published with good intent and [for] justifiable ends, shall be a sufficient defense, the jury having the right to determine the facts and the law, under direction of the court.

U.S. Const. amend. I states:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

It would be wise, before we wade deeply into the morass provided in the litigative pursuits of the Hustler publications, to recall clearly and with specificity what summary judgment is all about. It should be apparent that if the product with which we are concerned is so acceptable or important, then the purveyor should have no objection to a jury review and discernment. This court made a serious effort in *Cordova v. Gosar*, 719 P.2d 625 (Wyo.1986), as followed by *Davenport v. Epperly*, 744 P.2d 1110 (Wyo.1987), to properly understand the diverse applications of summary judgment as a procedural deterrent to the

litigant's right to a jury trial.[1] In *Cordova* and *Davenport,* summary judgment was recognized in a six stage review: (1) legal sufficiency of the complaint; (2) procedural sufficiency of the motion for summary judgment and attached affidavits and deposition material; (3) substantive sufficiency of the affidavits to initially support the motion; (4) procedural sufficiency of responsive affidavits; (5) substantive legal issue disposition (factual issues not relevant); and (6) disposition if there are no material issues of fact (material factual issues do not exist). *Cordova,* 719 P.2d at 635–36.

Consequently, when an adequately developed summary judgment litigative attack is unleashed, the decisional process addresses a contended basis for granting the relief by either of two decisions: (a) a dispositive rule of law which controls without regard for conflicting schemes of fact; or (b) absence of material issues of fact to be determined from the affidavits and depositions as admissible evidence if a trial were to be held.

Summary judgment then, if properly developed, either presents a law case, *Dean W. Knight & Sons, Inc. v. State ex rel. Dept. of Transp.,* 155 Cal.App.3d 300, 202 Cal.Rptr. 44 (1984), or a no factual conflict case, *Davenport,* 744 P.2d 1110. It is now apparent that the federal court system, through the *Triad* cases, *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *cert. denied* 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 527 (1987), has moved beyond the conventional standard for state court and prior federal law. This effort has not met with acceptance among the state judiciary and particularly not in Wyoming. This court has not been willing to accept the supposition of federal cases to base "trial" upon affidavits and bits and pieces of deposition material rather than the integrity of an actual trial with live witnesses and, perforce, even a jury decision.

In simplest text, if we are looking at the component of summary judgment involving existence of a material issue of fact, the principle is stated:

> The motion for summary judgment should be sustained in the absence of a real and material fact issue considering movant's burden, respondent's right to the benefit of all favorable inferences and any reasonable doubt, with credibility questions to be resolved by trial.

*Cordova,* 719 P.2d at 640.

In broader text, we have alternatively stated:

> "* * * 'Summary judgment should not be granted where contradictory inferences may be drawn from undisputed evidentiary facts.' * * * 'Even where the facts bearing upon the issue of negligence are undisputed, * * *, if reasonable minds could reach different conclusions and inferences from such facts, the issue must be submitted to the trier of fact.' * * * ' "Evaluative judgment between two rationally possible conclusions from facts cannot be engaged in on summary judgment." ' * * * 'Summary judgment is not appropriate where the record, including documents and pleadings, establishes facts which give rise to contradictory inferences, one of which supports the party opposing the motion.' * * * " * * *

---

1. A rank amateur would recognize that a major war, which will be determinative of the American civil justice delivery system, is being waged around summary judgment. The idiom of this time is anything to avoid trial and, even more so, a jury trial. See, for example, the President's Council for Competitiveness, Agenda for Civil Justice Reform, which would require the trial court to make an exclusive finding of fact (based on affidavits and whatnot) *before summary judgment could be denied.* The presumptiveness of the recommendation is that summary judgment should be granted and that reason is required to reject. Avoiding jury consideration at all costs is clearly apparent from this source and other major movers who seek to reconstruct the American judicial system. See Finding 8, p. 20, Table of Recommendations, Agenda for Civil Justice Reform. *See also* Clermont & Eisenberg, *Trial by Jury or Judge: Transcending Empiricism,* 77 Cornell L.Rev. 1178 (1992).

"* * * The motion for summary judgment is a drastic remedy and one which is designed to pierce the formal allegations and reach the merits of the controversy—but only when no material issue of fact is present. * * * Although both parties are obligated to come forward with their evidence, the burden is on the moving party to demonstrate *clearly* that there is no genuine issue of material fact and if that is not done, the motion for summary judgment should be denied. This court looks at the record from the viewpoint most favorable to the party opposing the motion, giving to him all favorable inferences to be drawn from the facts contained in the affidavits, exhibits, and depositions. * * *

"* * * If the evidence is subject to conflicting interpretations or reasonable minds might differ as to its significance, summary judgment is improper[.]" *Weaver v. Blue Cross–Blue Shield of Wyoming*, Wyo., 609 P.2d 984, 986–987 (1980).

Precedentially significant are the credibility and the reasonable-inference principles. * * *

* * * * * *

We would synthesize the general principles advanced by some Wyoming cases and general standards of many well-reasoned cases from the federal courts and other states:

(a) The motion for summary judgment is a drastic remedy and one which is designed to pierce the formal allegations and reach the merits of the controversy—but only when no material issue of fact is present. Although both parties are obligated to come forward with their evidence, the burden is on the moving party to demonstrate that there is no genuine issue of material fact.

(b) The court should scrutinize with care movant's affidavits and indulge leniency to respondent's affidavits but not to permit overtrading on the indulgence of the court since there must be a genuine issue of a material fact to be tried after looking at the record from the viewpoint most favorable to respondent and giving to him all favorable inferences to be drawn from the facts contained in the affidavits, exhibits, and depositions.

(c) When credibility is to be tested, the witnesses should testify at trial.

(d) Cross-motions do not concede the absence of factual issues.

(e) Finally, then, to determine whether the evidence is in factual dispute or subject to conflicting interpretation or of differing significance with respondent afforded the benefit of reasonable doubt.

*Cordova*, 719 P.2d at 639–40 (emphasis in original).

The challenge then presented is to determine, as a result of the majority's decision, whether supersession of the Wyoming constitutional provision regarding the right to a jury trial explicitly stated in Wyo. Const. art. 1, § 20 is a determination as a matter of law without regard for conflicts of fact or whether we have the character of summary judgment determined by the conclusion that there is no material issue of fact presented.

Although I do not enthusiastically accept invalidation of the solemn provisions of the Wyoming Constitution, whether by summary judgment or otherwise, it becomes even less acceptable if a fact finding exercise is utilized as an adjunct of the summary judgment disposition. In recognizing that in essence what we label here as summary judgment is in actuality a fact finding exercise by appellate review, I respectfully and urgently dissent from this decision. Alternatively, I would think that if we start down this pathway, it is highly preferable for this court to declare Wyo. Const. art. 1, § 20 void and ineffective. This court can then start over with the sole protection to be provided in this jurisdiction for freedom of speech or liability for libel and defamation to come from the periodic incursion into constitutional law by the United States Supreme Court.

The overwhelming issue for this libel action appeal is whether, as a matter of law, Hustler Magazine's "comments" cannot be

found to be actionable under the Wyoming Constitution as limited to the extent it would be by the First Amendment decisions of the United States Supreme Court. The use in this case of a summary judgment proceeding to invalidate Wyoming Constitution requirements and guarantees is, in my opinion, unnecessary and inappropriate.

The first decisional examination made by the majority was whether an alleged defamatory statement "purports to state or imply 'actual facts about an individual.'" Maj. op. at 914 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 2706–07, 111 L.Ed.2d 1 (1990)). I find that inquiry and the coordinate concerns of the majority opinion to be, in totality, factual determinations and, consequently, not subject to resolution under the established rules of this court for summary judgment. *Cordova*, 719 P.2d 625. It should be clearly understood that the issue of this case is not whether the statements are determinatively actionable as a matter of law, but whether the statements cannot be actionable in any circumstance consequently justifying summary judgment disposition. Unfortunately, this court's opinion applies the matter of law summary judgment resolution by a comprehensive factual issue evaluation. Combining the two alternatives for a grant of summary judgment only logically results in a totally invalid conclusion. The majority first outlines the scope of expected factual issues:

> [A] court must scrutinize the type of language used, the meaning of the statement in context, whether the statement is verifiable, and the broader social circumstances in which the statement was made.

Maj. op. at 914. The majority then follows with a detailed factual analysis:

> *The type of language used.*
>
> The kind of language used may signal readers that a writer is not purporting to state or imply actual, known facts. * * * Clearly falling into this category are Hustler's statements characterizing Dworkin as: "'little guy' militant lesbian feminist," a "shit-squeezing sphincter in

her own right," "one of the most foul-mouthed, abrasive manhaters on Earth," a "repulsive presence," "a cry-baby who can dish out criticism but clearly can't take it," "Spence's foaming-at-the-mouth client," and "a censor."

*Id.* at 914–915. Having exercised this factual review conceptual interpretation, the majority then answers: "Under prevailing constitutional First Amendment safeguards, that language cannot, as a matter of law, form the basis for a defamation claim." *Id.* at 915.

Next examined is: *"The meaning of the statement in context."* This legal application of a factual review is considered when the majority factually applies:

> Certain formats—editorials, reviews, political cartoons, monthly features—signal the average reader to expect a departure from what is actually known by the writer as fact. As explained in another case, "[t]he reasonable reader who peruses [a] column on the editorial or Op–Ed page is fully aware that the statements found there are not 'hard' news like those printed on the front page or elsewhere in the news sections of the newspaper." *Ollman v. Evans*, 750 F.2d 970, 986 (D.C.Cir.1984), *cert. denied* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). * * *

> The Hustler article appears under the heading "Bits and Pieces" and is a regular monthly feature. The tone of the article is pointed, exaggerated and heavily laden with emotional rhetoric invoking first amendment principles. We are convinced that the average reader is fully aware that the statements found there are not "hard news." Readers of that magazine expect that Hustler's writers will make strong opinionated statements in that column, a recognized home of opinion and comment. That proposition is inherent in the very notion of a regularly appearing "Bits and Pieces" page which is akin to an editorial page.

Maj. op. at 915.

From this totally directed factual analysis in appellate review, the next topic, *"Verifiability of the statements,"* reaches

further for appellate adjudicatory fact finding. *Id.* at 915.

Continuing to apply the broad concepts of summary judgment adjudication, my objection to what is done does not end here since the search factually expands beyond the printed record within the topic of *"The broader social circumstances in which the statement was made." Id.* at 916. The context is stated: "The importance of social context has been recognized by the United States Supreme Court," and then the factual conclusion to determine that dismissal is proper is sequentially stated:

Dworkin is an antipornography activist whose activities are in the form of public advocacy and direct political involvement. She participated in the drafting of the Indianapolis antipornography ordinance that was enacted and then held unconstitutional. * * * Hustler's *Bits and Pieces* article is an *ad hominem* attack against an advocate of a social, moral and political viewpoint contrary to Hustler's. The statements in question were uttered in the context of an ongoing debate in which Dworkin seeks to destroy the industry of which Hustler is a part. In response, Hustler seeks to destroy Dworkin's viewpoint by vilifying its advocate. In such a heated and spirited confrontation, of which the statements are a part, abusive epithets, exaggerated rhetoric and hysterical hyperbole are expected.

*Id.*

Four statements are then examined "which appear more likely to be objectively capable of proof or disproof." *Id.*

The majority then tells us:

The four statements are: Dworkin is a "lesbian"; when Indianapolis contemplated an antiporn ordinance co-authored by her, supporters asked her to "stay away for fear her repulsive presence would kill it"; Dworkin "advocates bestiality, incest and sex with children"; and Dworkin initiated a "nuisance suit" against Hustler. We consider these statements in the light of Dworkin's legal burden of having to prove with convincing clarity not only the falsity of the statements,

but also that Hustler uttered them with knowledge of the falsity or in reckless disregard for the truth.

*Id.* at 916–917.

The majority then states, which defines the keynote for my attack on this summary judgment decision: "As shall be seen, Dworkin has not satisfied *her burden* in this summary judgment setting." *Id.* at 917 (emphasis added). Overtly missing is the initially emplaced burden of the movant to either show that disposition is proper as a matter of law or that no material factual issues exist. The first burden in application of Wyoming summary judgment concepts does not properly fall on a respondent.

The misapplication of the burden makes a point which could be continued through the balance of the majority opinion. The summary judgment had not been initially granted by the trial court or now approved by this tribunal as a matter of law except after judicial reference and analysis to the compelling and comprehensive factual conflicts. This is a stage six, *Cordova,* 719 P.2d at 636, summary judgment where conflicting facts are actually analyzed to then be determined by a favorable inference based upon the implication that no genuine issue is present. I cannot find that conclusion to properly follow from this recitation by even the wildest adaptation of the English language. The criteria for granting summary judgment is comprehensively and clearly defined by this court and cannot by any means be satisfied within this profusely demonstrated, factually conflicting appellate record.

This leads to my conclusion that the jury-directed fact finding function detailed in the Wyoming Constitution has been turned upside down. Summary judgment in this case becomes a trial mechanism for the fact finder trial judge and appellate court to become lawmaker, judge and jury regarding the solemn subjects of both freedom of speech and damage for libel addressed in Wyo. Const. art. 1, § 20. If the evidentiary status was that well-determined and self-evident, it would seem certain that the jury can properly decide. The

constitutionally constituted jury, with proper instruction, should reliably be expected to answer the demands of justice without preemption by a summary judgment decision. The only escape from this inevitable certainty is for the judiciary to avoid incursion into fact finding and to leave decision making to legal concepts. The majority here decides that under no circumstances or character of events can actionable libel be established by writings at issue in this litigation. If this is not true, we just turn the judiciary into the fact finder for it to slide into a conclusionary and reference comparison making instrumentality for all final fact finding for Wyoming defamation cases. I do not accept this to be procedurally correct or constitutionally valid.

Stripped of its complexities and the significant academic direction of analysis, this majority opinion simply tests the validity and consequent constitutionality under the United States Constitution of a firm and certain provision adopted by the founders of this state at the constitutional convention in 1889. I do not so lightly abandon the Wyoming Constitution to summary judgment adjudicative disposition. I find value in retaining the civil liability defenses which are constitutionally stated for this jurisdiction that "the truth, when published with good intent [for] justifiable ends, shall be a sufficient defense * * *." Wyo. Const. art. 1, § 20.

To first review the Wyoming cases, I would not find *Tschirgi v. Lander Wyoming State Journal*, 706 P.2d 1116, 1117 (Wyo.1985) to be faintly comparable where the issue there presented was essentially whether appellant was "wrestled to the ground." Since the appellant was essentially "wrestled to the ground," no factual issue was presented. *Id.* at 1117. That status cannot be compared to this case. Nor do I find the call-in radio broadcast portrayed in *Adams v. Frontier Broadcasting Co.*, 555 P.2d 556 (Wyo.1976) to be relevant authority. Recognizing that the case itself was a political decision relating to an alleged political figure, the validity of the statement of the anonymous caller was first, unexpected and, second, not knowingly untrue by the radio station when broadcast. Obviously, the appellate court in the case opted to favor call-in programs over possible derogatory comments by anonymous participants. That situation cannot be accurately related to the events of this deliberate publication thoughtfully prepared in considerable detail for which the fact finding exercise of present adjudication is employed.

Similarly, *Spriggs v. Cheyenne Newspapers*, 63 Wyo. 416, 182 P.2d 801 (1947) provides no summary judgment justification or persuasion since the case was determined by a jury verdict. John J. Spriggs, a participant in significant litigation, was an anathema to the members of the Wyoming Supreme Court, but at least the decision making, fact finding process was retained for jury examination. *Williams v. Blount*, 741 P.2d 595 (Wyo.1987) and *Oil, Chemical and Atomic Workers Intern. Union v. Sinclair Oil Corp.*, 748 P.2d 283 (Wyo. 1987), *cert. denied* 488 U.S. 821, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988) did not raise the constitutional question and likewise cannot provide authority for summary judgment inversion of Wyo. Const. art. 1, § 20.

This leaves *MacGuire v. Harriscope Broadcasting Co.*, 612 P.2d 830 (Wyo.1980) for discussion. In *MacGuire*, the issue was the existence of sufficient indicia of malice to defeat summary judgment. Conversely, for this present case, the actual existence of malice could hardly be questioned. We do not have here a contested malice case, we have a case where, despite malice, we are asked to determine whether First Amendment rights as interpreted by the United States Supreme Court supplement the dual interests of free speech and responsibility for misuse constructed into the Wyoming constitutional provision, Wyo. Const. art. 1, § 20. Furthermore, I would join with Justice Rooney in his special concurrence in *MacGuire* to follow his justified understanding of the basic nature of summary judgment and the disingenuous result if certain cases are casually excluded from its specifically established criteria and limitations. Justice Rooney said: "If there is a 'genuine issue as to any material fact,' a trial should be had to resolve it. The

plaintiff ought not be required to prove his case at the summary judgment stage. He need only establish that there is an issue of material fact." *MacGuire*, 612 P.2d at 841. Furthermore, he accurately added for determination of malice:

> "In reviewing an appeal from the granting of a summary judgment and in determining the existence of a genuine issue of material facts, the court must inquire from the viewpoint most favorable to the party opposing the motion, *Timmons v. Reed*, Wyo., 569 P.2d 112 (1977). Facts asserted by such party and supported by affidavits or other evidentiary material must be taken as true, *Trautwein v. Leavey*, Wyo., 472 P.2d 776 (1970), and be given every favorable inference, which may be reasonably and fairly drawn from them, *Bluejacket v. Carney*, Wyo., 550 P.2d 494 (1976)."

*MacGuire*, 612 P.2d at 841, Rooney, J., specially concurring. To be complete for Wyoming case law analysis, the political handbill case of *Phifer v. Foe*, 443 P.2d 870 (Wyo.1968), involving campaign disputes between public officials, can hardly be found to be applicable here where the differentiated malice issue predominated in the decision made.

I share with Justice Rooney a disinclination to create a general exception in defamation cases for the utilization of summary judgment. *MacGuire*, 612 P.2d at 840. However, I take that concern further in my analysis to look directly at the clear language of the Wyoming Constitution. I conclude that for defamation cases, we not only rewrite summary judgment concepts but also determine that the applicable Wyoming constitutional provision regarding freedom of the press, Wyo. Const. art. 1, § 20, is constitutionally invalid under the constraints of the Constitution of the United States. I find that opinion neither necessary nor appropriate. I take this position without legal embarrassment while recognizing that the requirements established by interpretation of the First Amendment to the United States Constitution are controlling upon the state court by virtue of the application of the incorporation doctrine through enforcement by the Fourteenth Amendment. *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931).

We are presented an interpretative responsibility which clearly embraces the differentiated concepts addressed by this court in *Allied–Signal, Inc.*, 813 P.2d 214. If clear and specific language means anything, the Wyoming constitutional provision cannot be reconciled with the decision this court now makes. Conversely, if I follow the pathway now taken by this present majority in utilizing a historical perspective, I likewise find the applied principles to be fallacious.[2]

I follow a perception gained through a close examination of both the initiating history and the specific language of the Wyoming constitutional provision. Its adaptation and utilization need take us no further than to determine that defamation provides an application for summary judgment identical to and not more easily provided than exists for any other civil litigation. The same standard should be followed. Contrarily, this majority now takes a constitutional provision and upends it by application of a differentiated concept of summary judgment which leads the trial judge and the appellate tribunal to make the fact finding decisions required for adjudicatory resolution.

---

**2.** It is recognized that utilization of history for interpretation of a constitutional provision or a statutory enactment is under review and attack to a greater extent at the present time than has ever previously occurred. *Sable Communications of California, Inc. v. F.C.C.*, 492 U.S. 115, 130, 109 S.Ct. 2829, 2839, 106 L.Ed.2d 93 (1989), Scalia, J., concurring; *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 527, 109 S.Ct. 1981, 1994, 104 L.Ed.2d 557 (1989), Scalia, J., concurring; Arthur Stock, Note, *Justice Scalia's Use of*

*Sources in Statutory and Constitutional Interpretation: How Congress Always Loses*, 1990 Duke L.J. 160 (1990); Richard Nàgareda, Comment, *The Appellate Jurisprudence of Justice Antonin Scalia*, 54 U.Chi.L.Rev. 705 (1987). *Cf.* John Paul Stevens, Essay, *The Shakespeare Canon of Statutory Construction*, 140 U.Pa.L.Rev. 1373, 1381 (1992). *See also* Nicholas S. Zeppos, *The Use of Authority in Statutory Interpretation: An Empirical Analysis*, 70 Tex.L.Rev. 1073 (1992).

Legal historians trace the ancestry of the Wyoming constitutional provision in adopted style to Chapter 60 of 32 George III, enacted in 1792 and known by the title of "Fox's Libel Act". Entitled "An Act to Remove Doubts Respecting the Function of Juries in Cases of Libel," the purpose answered was to require a finite jury decision in criminal libel proceedings. The Act assured an actual jury decision and limited the prior process wherein the scope of decision by the jury was constrained and the real decision was made by the court as a matter of law. *See Oakes v. State*, 98 Miss. 80, 54 So. 79 (1910). *See also* Annotation, 33 L.R.A. (N.S.) 207 (1911) and Annotation, 51 L.R.A. (N.S.) 369 (1914).

Although Fox's Libel Act originally addressed only criminal libel proceedings, in due time through early constitutional conventions and then clear identification in the Western states, the provision applied equally to either civil or criminal proceedings. That law and the American constitutional provisions which followed were intended to clarify the preeminence in fact finding left for the jury's consideration and verdict. This history cannot be properly applied to demean and diminish or extinguish the use of the jury for fact finding decision. Not so surprisingly, until recent time, that understanding of the purview of Wyo. Const. art. 1, § 20 did not create a question of a differentiated status regarding summary judgment from the usual civil case.

The majority similarly misunderstands the context of case law in adjoining states regarding these constitutional provisions. The burden of those cases, which will be considered in later review, was not to establish a differentiated class for defamation cases where summary judgment becomes more appropriate. It was rather to define the integration of the constitutional provisions to guarantee the similar right to trial by jury in for defamation.

The historical underpinnings of American law relating to nonsuit/summary judgment criteria are well established and firmly defined in relating to the disparate function of the jury to make the fact finding and the judge to determine issues of law. That

rule is: if there is some evidence to sustain the plaintiff's case, the weight and sufficiency is to be passed upon by the jury. *Hornsby v. South Carolina Ry. Co.*, 26 S.C. 187, 1 S.E. 594 (1887); *Lingenfelter v. Louisville & N.R. Co.*, 9 Ky.L.Rptr. 116, 4 S.W. 185 (1887). *See also Eaton v. Lancaster*, 79 Me. 477, 10 A. 449, 449 (1887) ("If there was any evidence which, if believed by the jury, would authorize a verdict for the plaintiff, a nonsuit should not have been ordered.").

These firmly established principles of general law were also equally applied to the defamation case. State constitutional provisions or statutory enactments which adopted the thesis of Fox's Libel Act are considered not to eliminate, but rather to assure the responsibility of the court to provide instructions on the law and to assure that fact finding was retained by the jury. Perhaps the most exhaustive case, *Oakes*, 54 So. 79, pursued this concept with a detailed examination of prior English cases. Clearly recognized in detail of numerous cases is the difference between libel per se and libel per quod. If the statement was determined to be libelous as a matter of law, the fact finding exercise by the jury was appropriately diminished. If the subject was libel per quod, the determinative obligation of the court was equally constrained. The difference in defamation cases is the additional requirement for libel per quod to require special damages to be actionable. *Boucher v. Clark Pub. Co.*, 14 S.D. 72, 84 N.W. 237 (1900). In quoting a much earlier English case, the Mississippi court in *Oakes* recognized with approval in regard to libel per se:

"Libel is a question of law, and the judge is the judge of the law in libel as in all other cases; the jury having the power of acting agreeably to his statement of the law or not. All that the statute does is to prevent the question from being left to the jury in the narrow way in which it was left before that time [passage of the statute of George III]. The jury was then only to find the fact of the publication, and the truth of the innuendoes; for the judges used to tell them that the intent was an inference of law, to be

drawn from the paper, with which the jury had nothing to do. The Legislature has said that it is not so, but that the whole case is to be left for the jury." *Oakes,* 54 So. at 81 (quoting *Rex v. Burdett,* 4 B. & A. 131, 1 How.St.Trials (N.S.) 1).

*Oakes* provides a detailed discussion of this understanding which clearly recognized defamation to be identical in adaptation with other civil actions:

The enactment of this statute was largely influenced by the argument of Alexander Hamilton in the case of *People v. Croswell,* [3 Johns.Cas. 365 (N.Y.)], *supra,* and by the opinion of Chancellor Kent rendered in the case. Hamilton only contended for the right of juries in libel cases to render a verdict as broad as the issue involved, and this contention was upheld by Chancellor Kent in the opinion rendered by him in the case. This provision was incorporated into our first Constitution, adopted in 1817, while this controversy over the rights of juries in libel cases was fresh in the minds of all men conversant with the then recent history of this country and of England. Had this controversy never arisen, there would have been no necessity for the adoption of this provision. Since the controversy centered around the rights of juries to render a general verdict in libel cases, as broad and comprehensive as such a verdict is in all other criminal cases, the conclusion is irresistible that its adoption was for the purpose of settling the right of juries so to do, and not to confer upon them the right to determine the law for themselves without the assistance, or against the direction, of the court. Indeed, any doubt on this point ought to be removed by the language of the Constitution itself, for it does not simply provide that the jury shall determine the law and the facts, but provides that it shall do this "under the direction of the court." *State v. Burpee,* 65 Vt. 1, 25 Atl. 964, 19 L.R.A. 145, 36 Am.St.Rep. 775, 790; *Com. v. Anthes,* 5 Gray (Mass.) 185; *Drake v. State,* 53 N.J.Law 23, 20 Atl. 747; 2 McClain's Cr.Law, § 1070; 3 Greenleaf,

Evidence, § 179; *Com. v. McManus,* 143 Pa. 64, 21 Atl. 1018, 22 Atl. 761, 14 L.R.A. 89; *State v. Syphrett,* 27 S.C. 29, 2 S.E. 624, 13 Am.St.Rep. 617; *Brown v. State,* 40 Ga. 689; *Edwards v. State,* 53 Ga. 428; *Sparf v. U.S.,* 156 U.S. 51, 15 Sup.Ct. 273, 39 L.Ed. 343; Cooley's Const.Lim. (7th Ed.) 665; *Franklin v. State,* 12 Md. 236; *Harris v. State,* 75 Tenn. 538.

If juries have the right to determine the law of libel for themselves, free from the control of the court, the result would be not only that the law would be uncertain, because of the different views which different juries might take of it, but their judgment of the law, however erroneous, would be final; for in that event neither the trial court nor this court would have any right to review same, and could grant no relief to a defendant, however erroneously he may have been convicted. The court would have no right to decide any question of law which might arise on the trial, by demurrer or otherwise. Should a citizen, under this construction of the Constitution, be indicted for libel, and the matter charged to be such be never so harmless or lawful, the court would be powerless to prevent his conviction and punishment, should the jury decide that, in its judgment, the matter charged was libelous. The jury would be the judge of the meaning of the Constitution and the statutes, whether statutes were valid, what the common law is, what the law of privilege is—in short, of all questions of law which could arise on the trial.

*Oakes,* 54 So. at 82–83.

It is said in *Harrington v. Butte Miner Co.,* 48 Mont. 550, 139 P. 451, 452 (1914) (quoting Odgers, *Libel and Slander* 604 (2d ed.)): " 'The judge, of course, may still direct the jury on any point of law, stating his own opinion thereon, if he thinks fit; but the question of libel or no libel must ultimately be decided by the jury.' " *See also* Annotation, *supra,* 51 L.R.A. (N.S.) at 371.

To be repetitive, the substance of these cases was not whether summary judgment

or nonsuit could ever be granted when issues of fact did not exist, but rather if issues of fact did exist appropriate to the law, then the jury decision was required. An early text states that principle in the following fashion:

> The court will generally direct judgment of nonsuit to be entered for the defendant:
>
> (1) If there is no evidence that the defendant published the words at all, or (if the statute of limitations be pleaded) that he did so within the period prescribed.
>
> (2) If there is no evidence that the words refer to the plaintiff.
>
> (3) If the words proved are not actionable per se, and there is no evidence of any special damage.
>
> (4) If the words are actionable by reason only of their being spoken of the plaintiff in the way of his office, profession or trade, and there is no evidence that the words were so spoken, or that the plaintiff held such office or exercised such profession or trade at the time of publication.
>
> (5) If the words are not actionable in their natural and primary signification, and there is no innuendo; or if the only innuendo puts upon the words a meaning that they cannot possibly bear. If, however, it is reasonably conceivable that those addressed might by reason of any facts known to them have put upon the words the secondary meaning ascribed to them by the innuendo, then it will be a question for the jury in which meaning the words were in fact understood. Whenever the words, though primarily not actionable, are yet reasonably susceptible of a defamatory meaning, the court will not as a rule grant the motion for a nonsuit. "It is only when the judge is satisfied that the publication cannot be a libel, and that, if it is found by the jury to be such, their verdict will be set aside, that he is justified in withdrawing the question from their cognizance." Where the words of the libel are ambiguous, allegorical, or in any way equivocal, and the jury have found that they were meant and used in a defamatory sense,

> the court will not set aside their verdict, unless it can be clearly shown that, on reading the whole passage, there is no possible ground for the construction put upon it by the jury. But where the words are not reasonably capable of any defamatory meaning, there the judge will be right in directing a nonsuit.

Mason H. Newell, *The Law of Slander and Libel* § 718, at 802–03 (4th ed. 1924) (quoting Kelly, C.G. in *Cox v. Lee*, L.R., 4 Ex. 288) (footnotes omitted).

The even more recent cases found from decisions in adjoining jurisdictions have not ignored these general principles. *Griffin v. Opinion Pub. Co.*, 114 Mont. 502, 138 P.2d 580 (1943) was determined on the basis that the statement was not libelous per se and, lacking allegations of special damage, the complaint failed to state an actionable claim. *Springer v. Swift*, 59 S.D. 208, 239 N.W. 171 (1931) recognized that at least for South Dakota, the Fox's Libel Act and the constitutional provisions that followed applied only to libel in that jurisdiction and did not include slander. *Brodsky v. Journal Publishing Co.*, 73 S.D. 343, 42 N.W.2d 855 (1950) recognized that if an article was not libelous per se, special damages must be alleged. That court further found that for libel per se, the plaintiff must be clearly identified in the challenged publication. That case did recognize where, however, an article alleged to be libelous is susceptible of different interpretations, one of which is defamatory and the other not, a question for the jury is presented. The only question resolved was whether the published article was libelous per se. The same understanding is provided in *Spriggs*, 63 Wyo. at 437, 182 P.2d at 808 (quoting 2 Cooley, *Constitutional Limitations* 955 (8th ed)):

> "Nevertheless, we conceive it to be proper, and indeed the duty of the judge, to instruct the jury upon the law in these cases, and it is to be expected that they will generally adopt and follow his opinion.
>
> "Where, however, the constitution provides that they shall be judges of the law 'as in other cases,' or may determine the

law and the fact 'under the direction of the court,' we must perhaps conclude that the intention has been simply to put libel cases on the same footing with any other criminal prosecutions, and that the jury will be expected to receive the law from the court."

The basic determinate and foundational issue in this appeal considers whether the characterized constitutional revolution for defamation stated to result from *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) essentially eliminates jury involvement. *See* Clarence Morris, *Modern Defamation Law* ch. 2 and ch. 3 (1978). *See also* Ella Cooper Thomas, *The Law of Libel and Slander and Related Action*, ch. IX, at 55 (1973). The *Sullivan* clear and convincing evidentiary test came in more recent times to be joined, in the federal court system, with an evolutionary change for summary judgment. Within the current purview of the United States Supreme Court in denigrating rights to tri-

al and jury in the *Triad* cases, *Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505 was broadly phrased as a summary judgment decision and directly involved a *Sullivan* perspective of defamation.

*Liberty Lobby, Inc.* has not been accepted as a procedural reconstruction of Wyoming summary judgment law. However, the context and concepts advanced in this majority opinion cause concern that by indirection, something new has been created without stated intention, either by defining a separate category of defamation summary judgment or embracing a change in basic Wyoming summary judgment law. *See* Rodney A. Smolla, *Law of Defamation* § 12.07[3][b], at 12–35 (1992) in discussion of the convincing clarity requirement for proof of actual malice and the summary judgment requirement of disproof by the respondent derived from *Liberty Lobby, Inc.*[3]

When we pass through the sweep of current American defamation and First

---

**3.** The argument favoring availability of summary judgment in the defamation case has a striking resemblance to the broad scope attack on the American tort system, particularly resulting from medical malpractice cases. A text which yields to a clearly pro-media basis, Smolla, *supra*, § 12.07[1][b], at 12–32.3 (quoting *Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F.Supp. 947, 954 (D.D.C.1976)), recognizes:

Suits against the media often chill first amendment freedoms because of the huge costs attendant to carrying a defense through trial. * * * Summary judgment was thought of as a screening device particularly useful in first amendment cases as a tool for "shielding the press from harassment."

Persuasive argument by variant special interest groups that they should be shielded from exposure to costs of defense from claims of misconduct or fault is clearly not an unexplored phenomenon in current American adjudicatory developments. Efforts to federalize products liability is clearly the most pertinent present example. *See* President's Council on Competitiveness, The Agenda for Civil Justice Reform. Extremely short statutes of limitation for professional liability and specialty actions like defamation are apparently not found to be acceptable alternatives. That continued anxiety has now brought many specialized economic interests of this nation to seek success by a legislative agenda where the litigative results were dissatisfying.

A fair evaluation was provided by Morris, *supra*, ch. 6, at 62–63:

The satisfying gains achieved in the freedoms of speech and press have been accompanied by a less welcome loss. Many innocent victims of vilification who could formerly go to law for vindication and compensation no longer have legal remedies. Furthermore, the majority of defamers who are advised that they will probably not be held liable for publishing a particular slur are not likely to go overboard in making detailed, prominent, and completely exculpatory apologies, if indeed they retract at all. Certainly, the immune detractor will seldom be generous to the point of compensating his victim for any financial losses caused by the canard.

It is not necessary for me to engage in ptolemaics about these major economic, philosophic and political trends now swirling like a maelstrom in contemporary American society to support my thesis that this court should not effectively disembowel the Wyoming constitutional provision by a summary judgment anticipation that it is required in order to meet federal First Amendment standards. I do not think that the cases decided by the United States Supreme Court since *Sullivan* rewrite Wyoming law to require judiciary fact finding, because the topic of contended wrong is defamation and libel. Certainly the United States Supreme Court cannot make that imposition upon the Wyoming Constitution by direction of the procedural adaptations of *Liberty Lobby, Inc.* and the other two of the *Triad* cases. *Cf.* John H. Langbein, *On the Myth of Written Constitutions: The Disappearance of Criminal Jury Trial*, 15 Harv.J.L. & Pub. Pol'y 119 (1992).

Amendment media cases involving the United States Constitution, starting with the incorporation doctrine application of the United States Constitution to state decisions by the Fourteenth Amendment in *Stromberg,* 283 U.S. 359, 51 S.Ct. 532, and continuing to *Masson v. New Yorker Magazine, Inc.,* —— U.S. ——, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991), we pass by a course of guide posts or obstructive cases along that case law pathway. Overtly, we recognize the case of the new revolution, *Sullivan,* 376 U.S. 254, 84 S.Ct. 710; observe the application of *Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964); acknowledge the application to civil litigation of *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), *cert. denied* 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983); understand the confusion emanating from *Hutchinson v. Proxmire,* 443 U.S. 111, 120 n. 9, 99 S.Ct. 2675, 2680 n. 9, 61 L.Ed.2d 411 (1979); pass by *Time, Inc. v. Pape,* 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); and then come to *Masson,* —— U.S. ——, 111 S.Ct. 2419. Within this process, I do not ignore *Milkovich,* 497 U.S. 1, 110 S.Ct. 2695 to ask: what answer does it provide? The majority in *Milkovich* determined that all but one of the incidents reflected in the misquotations involved issues of fact. The dissent authored by Justice Brennan, with whom Justice Marshall joined, found a further issue of fact in the last misquotation. That direction can hardly justify the adjudicatory fact finding summary judgment decision required to favor Hustler Magazine here.

Careful, comprehensive and detailed analysis of malice, malice in fact, malice implied, malice that is something else, willful misconduct, gross negligence, ordinary negligence, *Troman v. Wood,* 62 Ill.2d 184, 340 N.E.2d 292, 299 (1975), intentional misstatement, and so forth, can provide, as it has, a world of topics for law journal analysis. In recent review, see Paul D. Driscoll & Kyu Ho Youm, *Harte–Hanks Communications v. Connaughton: The U.S. Supreme Court's Application of the Actual Malice Rule,* 14 Comm. and the Law 57 (1992). *See also* Kate Silbaugh, *Sticks and Stones Can Break My Name: Nondefamatory Negligent Injury to Reputation,* 59 U.Chi.L.Rev. 865 (1992). The point resulting from this review, however, despite the *Triad* cases and their non-jury trial concepts, is that in *Masson,* the United States Supreme Court required the factual review to be resolved in a reordered jury trial decision.

Appropriate limitations on the exercise of "free speech" are recognized in current cases. *See, e.g., Burson v. Freeman,* —— U.S. ——, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) and *Zarsky v. State,* 827 S.W.2d 408 (Tex.App.1992). Likewise, the courts have recognized that fact finding in assessing any First Amendment limitation—for this case compensatory defamation liability—should be left (as the Wyoming Constitution actually requires) with the jury. That recognition in *Masson,* —— U.S. ——, 111 S.Ct. 2419 has support from other cases. *Stone v. Essex County Newspapers, Inc.,* 367 Mass. 849, 330 N.E.2d 161 (1975) provides a similar result by an ordered retrial for the jury decision. *Goldwater v. Ginzburg,* 414 F.2d 324 (2nd Cir.1969), *cert. denied* 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970) approved denial of initial summary judgment and affirmed the resulting jury verdict in that libel litigation. *Cf. Southard v. Forbes, Inc.,* 588 F.2d 140, 146 (5th Cir.), *cert. denied* 444 U.S. 832, 100 S.Ct. 62, 62 L.Ed.2d 41 (1979), where Judge Thornberry, in dissent, recognized the jury question presented in similar thought with the statement of Justice Rooney in his special concurrence in *MacGuire,* 612 P.2d at 840.

Furthermore, when summary judgment is emplaced for disposition through its affidavit and deposition review, we do not have the full record from which an adequate appellate examination to assess evidentiary sufficiency can be made. See, conversely, *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989); *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); and *Associated Press v. Walker,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094

(1967), *cert. denied* 391 U.S. 966, 88 S.Ct. 2036, 20 L.Ed.2d 880 (1968).

We should be reminded that the comfort provided by the Wyoming Constitution has, for this past century, sufficed admirably. We should then ask ourselves: what is there in this continuum of United States Supreme Court decisions to now justify a Fourteenth Amendment due process determinate requiring invalidation of one of our constitution's very significant provisions? Again stated, that provision is:

Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right; and in all trials for libel, both civil and criminal, the truth, when published with good intent and [for] justifiable ends, shall be a sufficient defense, the jury having the right to determine the facts and the law, under direction of the court.

Wyo.Const. art. 1, § 20.

Directly stated, segment four of the majority opinion determined that *good motives and for justifiable ends* should be disregarded and discarded in the defamation case as criteria for liability or the absence thereof. Maj. op. at 920. I cannot find that resolution in Wyoming constitutional reconstruction to be ordered by persuasive case law in the decisions of the United States Supreme Court. That precedent, in my opinion, does not justify or require invalidation of the constitutional provisions of Wyo.Const. art. 1, § 20 regarding both free speech and responsibility for defamation. I will not invite *bad faith and unjustifiable ends* to be stuck on the Wyoming Constitution like barnacles to provide a wrongdoer immunity from defamation and misconduct.

Overtly, obviously and without any question, if I engage in a similar degree of fact finding, Hustler and its principals acted with the highest degree of intended malice, bad faith and viciousness. No semblance of good faith and honest motive is to be portrayed. I envision the Wyoming Constitution as retaining a factor of validity that *truth, good faith and honest intent* do have a significance for determination of immunity applied judicially to the perverted

Hustler material embodied here. Consequently, the singularly defined, constitutionally clear and unquestioned responsibility of the jury in defamation and libel cases surely should not be ignominiously discarded by any appellate rewriting of the Wyoming Constitution.

I agree with the balanced relationship between freedom to write and responsibility for willful and significantly negligent harm:

The constitutionally recognized interest of the individual in his reputation is not and can not be measured solely in terms of monetary compensation. At the least, the individual has an interest in preserving and restoring his reputation through an authoritative and publicly known determination that an injurious statement about him is in fact false. To foreclose or restrict the availability of the judicial process as a means of securing such a determination prevents the individual from obtaining the effective vindication to which he is entitled.

*Troman*, 340 N.E.2d at 297.

I dissent because of an unwillingness to accept this trial by affidavit for adjudicatory fact finding processes in a defamation case. In the even more basic concept, I would firmly contend that the *mandatory* text of the Wyoming Constitution should not be denied, discarded or rejected by any decision made on the subject by summary judgment. If a libel suit resulting from obscene personal attacks printed on the pages of Hustler Magazine cannot, in the Wyoming state court system, be accommodated within the text of the Wyoming Constitution requiring a dual respect of free press and responsibility for misconduct, I would leave supersession of our constitution for action by the federal courts. I do not find it necessary for us to do it. *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 57, 91 S.Ct. 1811, 1826, 29 L.Ed.2d 296 (1971), White, J. concurring in the judgment. Absolute immunity should not be required to cultivate activated health in our media and guarantee their full First Amendment exercise of the right of communication. " 'Neither lies nor false com-

munications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation.'" *Time, Inc.*, 401 U.S. at 292, 91 S.Ct. at 640 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968)). I am even more emphatically convinced that the mechanism of decision should not be summary judgment as a substitute for the thoughtful analysis of citizens as our peers through the jury trial. Goodness, badness, good faith and demonstrated malice are not such esoteric concepts that only the judiciary, and not even the media, is afforded the opportunity and responsibility to differentiate.

Consequently, I would like to invite a trial where Hustler has the opportunity to prove either good faith or validity or to pay the price if unable to convince the examining jury. If that cannot suffice as guideposts of Wyoming behavior within our state's constitutional concepts, I would require the United States Supreme Court to be the first to then have the duty of rewriting our state constitution.

Consequently, I dissent.